**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David LEHMAN, Defendant-Appellant. No. 18332.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1971.

Decided June 30, 1972.

Rehearing Denied July 18, 1972.

Certiorari Denied Oct. 24, 1972.

See 93 S.Ct. 273.

---

Harvey M. Silets, Theodore A. Sinars, Chicago, Ill., for defendant-appellant; Harris, Burman & Silets, Chicago, Ill., of counsel.

James R. Thompson, U. S. Atty., Robert A. Filpi, Asst. U. S. Atty., William J. Bauer, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before MAJOR [1] and HASTINGS, Senior Circuit Judges, and PELL, Circuit Judge.

PELL, Circuit Judge.

This is an appeal from a judgment following the conviction by a jury of Dr. David Lehman, an oral surgeon, of violating 26 U.S.C. § 7201.[2] The four count indictment had charged Lehman with filing false and fraudulent joint income tax returns on behalf of himself and his wife for the years 1962 through 1965. The returns failed to include substantial amounts of cash receipts from Lehman's professional practice. The district court sentenced him to prison for three years on each count, the sentences to run concurrently, and imposed a $5000 fine plus costs.

On this appeal, Lehman raises many objections to his conviction, ranging from the erroneous admission of his confession and certain documents to the invalidity of the sentence levied upon him. The sweep of the defense, both here and at trial, does not negative that Dr. Lehman for the years in question had paid significantly less income tax than he should have if correct returns had been filed.[3]

I

In January 1966, Lehman received a notice that the Internal Revenue Service was conducting an audit of his tax returns. He called his accountant who told him that the IRS would interview him and that he, the accountant, wished to be present when that interview oc-

---

1. Senior Circuit Judge Major, whose death occurred on January 4, 1972, heard oral argument, but did not participate in the adoption of this opinion.

2. 26 U.S.C. § 7201, "Attempt to evade or defeat tax":
 "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.
 (Aug. 16, 1954, ch. 736, 68A Stat. 851.)"

3. The returns had been prepared by Lehman's accountant, who had relied on the data in the doctor's books and records.

curred. The next month, Lehman received and signed a Form 872, extending the statute of limitations on his tax returns. Thereafter, Dr. Lehman, apparently in anticipation of the expected interview, caused the reconstruction of some patient receipts that had been destroyed. He also, in the words of the district court, "read a do-it-yourself article [in a dental journal] that recommended the self-handling of interviews with Internal Revenue Agents without the participation of auditors or attorneys."

On the morning of June 8, 1966,[4] a few days after Lehman had read the article, Special Agent Barrett and Revenue Agent Fatten met Dr. Lehman in the parking lot behind his office. They told him their names and titles, presented their credentials for inspection, and informed him they "were going to make an investigation of his income tax returns." The agents had not arranged beforehand with Lehman for an appointment. The doctor said that he had a longstanding golfing date, but he agreed to spend an hour or so with the agents. They waited while Lehman treated two patients. The doctor made no effort to call his accountant at that time nor thereafter until subsequent to the departure of the agents.

The actual interview took place from about 10:30 a. m. until 5:15 p. m. However, the crucial part of the conference occurred in mid-afternoon.

At that time, Agent Barrett told Dr. Lehman that he wanted to see his patient receipt records and asked him to pull a drawer of the patient cards. The two agents then randomly compared some of the patient records with the cash receipts journal. The first card pulled had been properly recorded in the journal. The next card was not reflected in the entries. Barrett asked why it

was not, and, when the doctor responded that he did not know, the agent said, "there must be some explanation." The doctor became very nervous, the exchange of remarks was repeated, and Barrett went on to the next card, which also had not been recorded. Dr. Lehman stated that he could not explain the discrepancies.

Barrett then propounded a series of questions directed at uncovering possible reasons for the nonreporting of the receipts: could any of the "girls" in the office have been embezzling from Lehman; could Mrs. Lehman have taken the funds; did the doctor have a drinking problem, a gambling problem, or a drug problem; had he loaned any money; was he involved with "another woman." Dr. Lehman denied each suggestion. He also denied that there was a double set of records.

Agent Barrett noticed that some of the patient cards had an "x" in the upper right hand corner. He proceeded to leaf through the tray, looking for cards so marked. One at a time, he pulled them out and handed them to Agent Fatten to verify their recording. After each card was found to be unrecorded, Barrett asked the doctor why it was not entered. Each time the doctor responded that he did not know. This procedure continued for some ten cards, with the doctor becoming increasingly nervous and perspiring profusely. After the tenth card was examined, Dr. Lehman told the agents not to pull any more cards and asked if he could lie down on a couch in a recovery room.

While for the purpose of this opinion we are assuming that Lehman asked the agents not to pull any more cards, the record is not entirely persuasive that Lehman was in fact ordering a cessation of the examination of the cards as opposed to his merely wanting momentary

---

4. The events of this date are crucial to most of Lehman's appeal contentions, although some confusion exists as to exactly what the participants said to each other, which will be treated as found pertinent upon consideration of the points raised. Where conflict exists as to what was said, we are not unmindful that the district court was, much better than we are, able to make the credibility determination.

relief from the exposure of his record situation. Thus, apparently about the time he retired to his couch, he stated with regard to the examination of the records, "I cannot take it *at this time*."

While Lehman was lying down, Agent Barrett continued to question him about the unreported receipts. The doctor said, "I just don't know what to do" and inquired whether not having the receipts recorded on the books was criminal fraud. The agent replied that it could be if no "plausible excuse or . . . answer" could be found for the failure. Dr. Lehman then asked, "What advice can you give me?", to which the agent said that he could not give him any advice.[5] However, he suggested that Dr. Lehman could tell him the truth so that they could "get at the root of the trouble." Shortly thereafter, Dr. Lehman arose from the couch and paced up and down the corridor. He questioned Barrett about Dr. Mortimer, a Joliet physician who had been convicted of tax evasion.

Despite the doctor's request that the agents not look at any more cards, Barrett pulled another file drawer and leafed through it. Barrett's testimony was candid as to this matter:

"Along about then I got up and went back to the patient record cards and reached up and pulled out the tray of cards for the letter 'A' and I came back and sat them on the table.

"The doctor said, 'Don't look at any more of those cards, don't look at any more cards.'

"I said, 'Well, why not? Am I going to find more cards that are not recorded in your records?'

"He said, 'I just don't know.'

"I was leafing through the cards and finally took two more out with 'X's' on them and we found that these had not been recorded and I went to look for some more and he said, 'Please don't take any more cards out,' and with that, I didn't take any more cards out of the tray."

A brief lull in the conversation followed. After asking what would happen to him, his family and his business, Dr. Lehman confessed that he had not been recording all his patient receipts. This admission was made between 3 and 4 p.m. He then explained his scheme for not recording a portion of his receipts and indicated that he had not reported in excess of $40,000.[6]

He expressed concern about the matter becoming public. Agent Barrett said that if Lehman cooperated with him, he would not have to make any third party contacts. Thereafter, the doctor agreed to give the agents his books.

---

5. In his briefs, the appellant states that he asked the agents, "What advice can you give me?"; "Who can help me?"; and "Whom can I call?" The agents agree that Lehman did ask them for advice. Special Agent Barrett testified that he understood that question to mean whether Lehman should make an admission about the discrepancies in the books. Barrett denied that the defendant had inquired "Who can help me?" and "Whom can I call?" In response to defense counsel's leading question "[Lehman] did ask who could he call?," Agent Fatten said, "Yes." When Lehman testified at the suppression hearing, he made no statement that he had inquired whether he could call anyone.

This contradictory evidence leaves us unconvinced that Lehman did, in fact, explicitly pose the question "Whom can I call?" Barrett's refusal to advise Lehman how he should handle his problems should not be tortured into an interdiction of the doctor's freedom to call whomever he had desired. In any case, there is nothing which leads us to believe that there were any questions or answers which could have caused the doctor to feel that he was not perfectly free to telephone his attorney or his accountant.

6. Barrett testified that Dr. Lehman said he was unsure about 1965 "because at the time that Dr. Mortimer went to jail, he quit suppressing . . . his patient receipts, because he had this great fear that this same thing could happen to him, so he quit not reporting all of his receipts."

At the end of the interview, when the agents had gone to the parking lot to leave, Dr. Lehman called them back to get the books so that they could get started on the audit that night. Lehman said he was glad it was over and thanked the agents for the consideration they had shown him.[7]

## II

The conduct of the IRS agents at the June 8th interview was the basis for Dr. Lehman's pretrial motion to suppress. In that motion he alleged that the agents had obtained his oral statements, books and records in violation of his fourth, fifth and sixth amendment rights.

A pretrial hearing lasting more than two days was held to determine the validity of these contentions. In addition, the district court afterwards was provided with legal and factual memoranda. In reaching a decision, the district court, although questioning the necessity, did apply the standard of "beyond a

reasonable doubt" to the voluntariness issue.[8] While "not condon[ing] the acts of the agents," the court concluded that Lehman had voluntarily offered the statements, books and records. As a result of this determination, the materials —which the appellant correctly characterizes as "the keystone of the Government's case"—were submitted to the jury.

In a multi-pronged attack upon the admission of the evidence, Lehman points out that he was not told on June 8 that he was the subject of a criminal fraud investigation [9] nor that he had the right to remain silent, the right to have an attorney represent him and the right not to produce any books or records that might tend to incriminate him.

■■ Although Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is inapplicable to Lehman's interview,[10] the Supreme Court has cautioned the courts to be aware when reviewing voluntariness in pre-*Miranda* cases that the failure to advise a defend-

7. While Lehman was still offering cooperation, which cooperation apparently terminated that evening after a telephone conversation with a lawyer, the agents had arranged to photograph the estimated 20,000 patient cards after office hours when employees and patients would not be present. Further, at Lehman's request, Barrett agreed to come to the doctor's residence to assist the defendant in counting and taking to the bank some $30,000 to $40,000 in cash which he had hidden in his television set. Because Mrs. Lehman was unaware of Lehman's tax troubles, however, Barrett suggested that the doctor first go home and explain the situation to her.

8. In Lego v. Twomey, 404 U.S. 477, 488–489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), decided after the submission of briefs and oral argument in this case, the United States Supreme Court held that the strict standard of "beyond a reasonable doubt" is not constitutionally required. The Court further declared that "[i]t is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power than as a constitutional rule." Instead, the prosecution "must prove at least by a preponderance of the evidence that the

confession was voluntary." The Court noted that the States are free, pursuant to their own law, to adopt a higher standard. No such more stringent test is applicable to the case before us. Whether Lehman's confession was voluntarily made is to be determined, therefore, under the preponderance-of-the-evidence standard.

9. At the hearing on the motion to suppress, it was stipulated that at the time of the June 8th interview a criminal investigation was in fact in progress.

10. In United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969), this court held that a taxpayer under criminal investigation must be advised that he is the subject of such an investigation and that, regardless of his subjective state of mind, he must be given the "*Miranda* warnings" at the inception of the IRS's first contact with him after the matter had been transferred to the Service's Intelligence Division. *Dickerson* applies to interrogations taking place after the date of the decision, July 28, 1969. Dr. Lehman's interview occurred in June 1966. We treat *Lehman* therefore as a pre-*Miranda* case. *See also* United States v. Gallagher, 430 F.2d 1222 (7th Cir. 1970).

ant "of his right to remain silent or of his right respecting counsel at the outset of interrogation . . . is a significant factor in considering the voluntariness of statements later made." Davis v. North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). In light of the other circumstances of this case, we find that the omission of these warnings did not render Dr. Lehman's confession involuntary.

■ Clearly, the IRS agents used no physical coercion against Dr. Lehman. Nor is there any credible evidence of promises of nonprosecution or of leniency. We recognize, though, that psychological coercion alone can result in an involuntary confession, e.g., Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). Although Dr. Lehman certainly was not a victim of the kind of blatant compulsion suffered by the defendant in *Lynumn*, we accept the contention that more subtle psychological ploys might be just as effective—and just as impermissible.

We are not persuaded, however, that the present case presents such an example of psychological coercion. Our independent evaluation of the record leads us to conclude that the district court was correct in determining that Dr. Lehman's will was not overborne at the time he confessed.

The factors that the appellant cites as proving coercion must be viewed in the particular context in which they are found.

Thus, that Lehman perspired freely and was nervous and distressed is certainly consistent with the mental condition which would naturally follow the incipient detection of a criminal offense that could have disastrous effects upon a burgeoning professional career. *See* Zamora v. United States, 369 F.2d 855, 857 (10th Cir. 1966), cert. denied, 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967). Knowledge of the consequences flowing from Lehman's awareness of the imprisonment of a fellow practitioner in the healing arts for the same offense would be particularly devastating to his equanimity. We note that the district court, after having observed Lehman on the witness stand at the suppression hearing, commented that he was an extremely nervous individual. Further, we find it significant that an employee of Lehman described him as trembling, faltering in his speech and not acting normal when he had entered his office with the agents on the morning of June 8. At that time, the only colloquy between Lehman and the agents had pertained to the agents' identification and to their proposed investigation of Lehman's tax returns.

■ It may well be that many people, although confident that their houses are in order, feel uneasy when interrogated by any law enforcement officer. This category would not in this sense exclude income tax agents, whether denominated "Revenue Agents" or "Special Agents." This human reaction, if it be such, cannot be conceived to be a per se basis for finding psychological coercion, even though it might be a substantial factor in some circumstances, e.g., the indefinitely incarcerated, illiterate indigent.

Lehman, however, had no knowledge that Barrett's status as "Special Agent" connoted the investigation of criminal fraud. The doctor contends he should have been told that a criminal investigation was in progress. Taking it from this that he had been unaware of the nature of the investigation and had assumed it was a routine audit, as his accountant had advised him it would be, his ab initio disquietude equates with the guilty knowledge that obviously was his.

■ While the subjective characteristics of an individual play a part in the determination of voluntariness, the district court in a careful analysis highlighted determinative factors which caused that court—and which persuades this court—to conclude that Lehman's will was not psychologically overborne.

While not wishing to extend this opinion unduly, inasmuch as the district

court's ruling on the motion to suppress is not reported, the district court noted the following: Lehman in anticipation of an interview had reconstructed certain records. Further he had read an article which could have caused him to believe that he should handle the interview by himself. Although he had been advised by his accountant that he should call the accountant in the event of an interview, he took no action to make any such call or to suggest to the agents that he would prefer to have the accountant present. One of his clerks was present when the agents arrived but was dismissed at noon. At no time did Lehman suggest that anyone else should be present or that the interview should be postponed or terminated. Although he originally announced that he only had a limited time for the interview, he telephoned his wife and a doctor friend to tell them he was busy without suggesting to the agents that the interview be continued to a later and more convenient date. When records were requested, the doctor knew where they were located, he produced them, and he answered all questions dealing with bookkeeping procedures. He made no claim that he lacked any understanding as to the manner in which his records were kept.

Although Lehman maintains that he felt confined and watched in his own small private office and that his will was eventually overcome by the agents' method of questioning, he found time during this period of alleged virtual confinement to discuss his academic achievements and to recommend to one of the agents what should be done for the treatment of emphysema. Lehman was in his own suite and not in custody and could have cut off the interview at any time. He was found to be a man of intelligence, education and maturity. He was apprised of his questioners' mission with regard to a determination of the correctness of his tax returns, and he was not completely unschooled in the implications of a tax investigation.

We further note that on at least two occasions the agents asked Lehman if he wanted to leave for his golf date.

While there is little question but that the interrogation continued with only slight interruption for nearly eight hours and that the questioning was persistent, perhaps bordering on occasion on being vigorous, nevertheless, on the particular facts before us we agree with the district court that the statements of Lehman were not vitiated by coercion. Nor, on the record, do we find the agents to be the allagrugous characters that they are painted to be by Lehman.

■ Dr. Lehman also condemns Barrett's asking him why certain bank dividends and interest were not reported on the returns. He states that under the then existing tax laws those dividends were not taxable and the interest was not required to be reported. He therefore concludes that "[t]he clear import of the questioning was to catch [him] off guard, and its success was certainly apparent."

Accepting the appellant's interpretation of the tax laws as accurate, we cannot agree that the questions prove Lehman's admissions were involuntary. First, Barrett's testimony at the suppression hearing indicates that the agent had failed to ascertain that the interest income stemmed from trustee accounts held for Lehman's children. Also, it would appear that while the dividends may not have been taxable as being within the $200 excludable amount, they nevertheless would have been reportable on a return. We think that Barrett was proceeding under an honest misapprehension. Further, we find no reason why the agent should have been foreclosed from making such inquiries, even if the information was only tangentially related to the primary topic of the nonreporting of income from Lehman's practice. Finally, in discussing the returns with the doctor,

Barrett made no misleading statements about the requirements of the tax laws.

█ Lehman asserts a violation of his fourth amendment rights in that the agents inspected two of his patient cards after he had asked them not to look at any more cards. There had been neither a search warrant nor an arrest. It was properly Lehman's province to put a complete stop to the examination of his records. Assuming that this was his intention and that he was not merely exclaiming in anguish at the thought of what a thorough check of the cards would disclose, indeed, what had already been substantially indicated, we turn to the two-pronged claim that this admitted conduct on the part of the agents renders the confession inadmissible and also is a proper basis for excluding from evidence the books and records later delivered to the agents.

As to the admission of guilt, the exclusion of a tainted confession stems from Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It seems clear that if *Wong Sun* is limited to its factual situation or to a substantially comparable factual situation it would have no application here. In that case the arrests were found to be without probable cause and a statement made by the defendant Blackie Toy contemporaneously with the arrest which followed a forced entry into the Toy residence was found to be so intimately bound up with the conditions and circumstances of the arrest as not to be an act of free will. We have here no illegal arrest nor, indeed, do we find a situation aggravated by oppressive circumstances. The district court found that Lehman's confession did not result from the agent's looking briefly at two additional cards and concluding they were unrecorded. While the district court placed its realistic finding instead on the doctor's voluntary submission of all the other patient cards which were examined and which contained the same incriminatory material, we would also, in agreeing with the result of the district court, place emphasis on the various other factors herein-

before enumerated which are the basis of our determination that Lehman was not psychologically coerced into confessing.

During this crucial period when it developed that the records which Dr. Lehman had permitted the agents to examine reflected that income had not been entered in the cash receipts journal, he asked if he could lie down and while reclining on his couch, he asked the agents about criminal fraud. Shortly thereafter he paced up and down the hall and then asked about Dr. Mortimer's case. He expressed concern about what would happen to him and his family and finally admitted that he had just not been recording all of his patient receipts.

We agree with the district court that the acts of the agent in pulling two more cards should not be condoned, but we likewise agree with the district court that it cannot be realistically said that this momentary action precipitated the confession. The agent made no effort to explain why he went ahead with an examination of two more cards nor did he contend that he had not understood Lehman as meaning that he should not look at any more cards. Nevertheless, he did discontinue looking at the cards when the request was repeated after looking at the additional two cards. As to why the agent would take the risk of destroying what was shaping up into a case for prosecution is not clear and it is no excuse that probably many agents have had sad experience with incriminating records disappearing or being destroyed or altered before legal processes could secure their production.

The most that can be argued is that the adage concerning the camel's back might have some application here. The two cards, however, were merely corroborative. They were not new evidence in the sense of being a different type of proof than that with which the agents were already acquainted. Considering Dr. Lehman's intelligence, education and maturity and the much more significant factors that had already entered into his deliberations when he retired to his

couch, we do not find the camel's back apothegm applicable. Interrelated, of course, is the fruit of the poisonous tree question proposed by the books and records themselves. The test is stated in *Wong Sun, supra* at 488, 83 S.Ct. at 417, as follows:

> "[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)."

The doctor had turned over records freely during the course of the day. Indeed, after the agents had already left his office he called them back to deliver books to them which they had left behind. Assuming the illegality of the examination of the two cards, we do not find that the records were "come at by the exploitation of that illegality."

Ultimately our resolution of the questions is that, on balance, we are of the opinion, confined to the particular factual situation here involved, and to the extent that the taking of the two additional cards was of questionable constitutional propriety, a sounder policy calls for invoking the maxim *de minimis non curat lex* rather than the rule of exclusion. While no doubt judicial opinions of the past four and a half decades have substantially modified the words of Mr. Justice Stone, "[a] criminal prosecution is more than a game in which the government may be checkmated and the game lost merely because its officers have not played according to rule,"[11] nevertheless we find that this principle has continuing viability where the infraction has the minimal consequences of those in the present case.

If the finding of two additional cards with unrecorded income entered into Dr. Lehman's deliberations as to whether to confess, it appears that at most they merely served as a reminder of that with which he was already painfully cognizant, namely, that his falsification of his records had been discovered.

The holding on this point must be confined to the narrow factual situation involved. We intend to say no more than that the policy dictating the exclusionary rule may not generate the application of the rule in the minimal and highly uncertain invasion of fourth amendment rights here involved. Law enforcement agents are given by this opinion no carte blanche. To violate the standards which have necessitated an exclusionary rule, even though the violation may seem slight at the time, is to court the risk of the unnecessary loss of a conviction that otherwise should have been secured.

Lehman further claims that the agents breached IRS regulations in obtaining his statements and records. He argues that the violations should have led to the suppression of the evidence. The IRS regulation upon which Lehman relies most heavily instructs special agents on how to conduct interviews with taxpayers:

> "Precautions To Be Taken[:] (1) To enhance the admissibility of any statement or other evidence, including books, records, memoranda, or papers of a taxpayer or principal under investigation, in the event of a trial of that individual, the special agent: (a) Will properly identify himself as a special agent of the Internal Revenue Service at the outset of the initial interview, producing his authorized credentials for examination; (b) Will not use trickery, misrepresentation, or deception in obtaining such evidence or in explaining, if asked, the taxpayer's or principal's constitutional rights or the purpose of the investigation; (c) Will not use language which might constitute a threat, intimidation or promise of immunity or settlement of the case; and (d) Will not deny an individual the right to counsel nor the right to

11. McGuire v. United States, 273 U.S. 95, 99, 47 S.Ct. 259, 260, 71 L.Ed. 556 (1927).

refuse to give any evidence or make any statements which such individual believes might incriminate him under any State or Federal law."

[Internal Revenue Manual MT 9300–20 § 9384.2]

Special Agent Barrett allegedly breached this regulation (1) by failing to advise the doctor of his right to counsel and right to remain silent; (2) by failing to inform Lehman that a criminal fraud investigation was in progress and that criminal fraud was present; and (3) by ignoring Lehman's pleas to stop examining his records. The first two "failures" refer to clause (b) of the regulation, which hinges on the phrase, "if asked."

■ Dr. Lehman maintains that the following remarks of his at the June 8th interview were requests for an explanation of his constitutional rights: "What advice can you give me?"; "Whom can I call?"; and "Help me. I just don't know what to do." The import of these inquiries, if viewed as isolated sentences, is not so clear as to require the interpretation Lehman proposes. When we consider the context in which the appellant made the comments, the ambiguity is largely dispelled. We think the trial court's characterization of the remarks is accurate: they were exclamations by a distraught man on the verge of confessing rather than requests for information about constitutional rights.[12]

In regard to the second "failure," we note that Lehman never asked whether a criminal investigation was in progress. He did inquire whether the nonrecording of the receipts could be criminal fraud. However, unlike Lehman, we find no fault in Agent Barrett's response to this question. At that point,

the agents did not have all the facts about the doctor's finances and his recordkeeping. It is difficult to understand how, by not giving a definitive answer, Barrett used trickery or deception on the defendant.[13] Further, if Lehman by that question was really inquiring whether he would be prosecuted, it would have been improper for Barrett to have replied "yes" or "no." The United States Attorney, not an IRS agent, determines when prosecution is warranted.

■ The agents concededly did continue to search through patient records after Lehman had requested them to stop. Even though we agree that this act contravened clause (d) of the IRS regulation, we cannot conclude that the suppression of the defendant's confession and records necessarily follows. We have already held that the agents did not obtain the confession and records in violation of Dr. Lehman's constitutional rights. It would be anomalous for us then to hold that the breach of an internal regulation of the IRS, designed to insure conformity to constitutional requirements, leads to the exclusion of evidence that the Constitution itself does not exclude.

Dr. Lehman also asserts that the agents practiced fraud and deceit in obtaining the statements, books and records. He relies upon the same factors he cited in support of his previous arguments: the agents' failure to advise him of his rights; their failure to inform him that the purpose of the interview was to gather criminal evidence; their alleged breach of IRS regulations; their alleged refusal to answer his inquiries; their use of "tricky" questions; and their "relentless" demands that he answer their questions, while ignoring

---

12. We note that the jury, which also passed on the issue of voluntariness, was fully informed that the agents had at no time advised Lehman either of Barrett's status as a criminal tax investigator or of any rights that Lehman had.

Nevertheless, it appears the jury did not choose to consider the confession as being involuntary.

13. The several references by Lehman to the criminal tax case involving Dr. Mortimer, who practiced in the same community the defendant did, strongly suggest that Lehman, in fact, was aware that failure to report income accurately can lead to criminal sanctions.

his repeated disclaimers of knowledge about the unreported receipts.

Because we have discussed these factors in our examination of other points raised by the defendant, we will merely add here a few comments directed specifically to fraud and deceit.

As the Government points out, the appellate court cases dealing with fraud in tax situations warn that revenue agents must not affirmatively mislead a taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal consequences, *e. g.,* United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir. 1970); Cohen v. United States, 405 F.2d 34, 36 (8th Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969); United States v. Sclafani, 265 F.2d 408, 415 (2d Cir. 1959), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L. Ed.2d 1534. We find nothing in the record in this case which indicates that the agents misled Lehman.

When the IRS agents met the doctor in the parking lot on the morning of June 8, Barrett identified himself as a Special Agent of the Internal Revenue Service and Fatten as a Revenue Agent. The agents showed the doctor their credentials.[14] Thus, they in no way attempted to conceal their identity. Nor could they have affirmatively misled Lehman as to their respective functions, for they said nothing on that topic and Lehman made no inquiries. That they did not tell the doctor later in the interview of the criminal character of the investigation also involved no misrepresentation. *See, e. g., Cohen, supra; Sclafani, supra;* Spahr v. United States, 409 F.2d 1303 (9th Cir. 1969), cert. denied, 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91. *See also* this court's opinion in United States v. Spomar, 339 F.2d 941 (7th Cir. 1964), cert. denied, 380 U.S. 975, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965), a pre-*Miranda* and pre-*Dickerson* case.

In sum, we find that the incriminating evidence was not obtained by fraud or deceit.

### III

Lehman also asserts that there should be a reversal because of restrictions on the cross-examination. This claim primarily relates to the testimony of Special Agent Barrett both at the suppression hearing and the trial.

It is so elementary as scarcely to need citation of authority that the scope of cross-examination is within the sound discretion of the trial judge. United States v. Hanahan, 442 F.2d 649, 655 (7th Cir. 1971); United States v. Bender, 218 F.2d 869, 873 (7th Cir. 1955), cert. denied, 349 U.S. 920, 75 S. Ct. 660, 99 L.Ed. 1253.

Here, though, it is contended that the court abused its discretion by placing unduly narrow and prejudicial limitations on the cross-examination.

In the first phase of claimed undue limitation, Lehman basically was attempting to show an impure motive on the part of the agents, that is, that they were consciously trying to deceive him and thereby make their case. A typical question concerned the pre-interview conversations between the agents.

While a taxpayer has a right to expect that the agents will not affirmatively mislead him into believing that the investigation is exclusively civil and that it will have no criminal consequences, United States v. Prudden, *supra,* we do not deem the approach here attempted to be appropriate for the demonstration of such an improper result.

What is pertinent and material is what was said and done by the agents at the time of the interview and whether that factual situation fell outside the pale of legal propriety.

---

14. The agents and Lehman agree that the agents displayed their credentials. Although Lehman and Agent Fatten testified that the doctor did not read the identification, he certainly had the opportunity to do so.

As stated by Mr. Justice White in his dissent in Massachusetts v. Painten, 389 U.S. 560, 565, 88 S.Ct. 660, 19 L.Ed.2d 770 (1968),

> "We might wish that policemen would not act with impure plots in mind, but I do not believe that wish a sufficient basis for excluding, in the supposed service of the Fourth Amendment, probative evidence obtained by actions —if not thoughts—entirely in accord with the Fourth Amendment and all other constitutional requirements. In addition, sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources."

The approach here if utilized would be without limitation and could easily send the fact finder off into an unchartable psychological morass of extremely dubious value. Thus, an agent's having had a violent quarrel with his wife that morning could arguably be a basis for concluding that his inability to retaliate against her caused him to vent his frustrations on the next taxpayer coming along. The manifestations of the frustration, that is, what the agent said and did at the time of the interview, would, of course, be provable, but we think what went into the psyche is beyond bounds.

While a psychiatrist may be interested in exploring such matters as the effect of parental spankings, and such exploration may be proper in judicial proceedings where mental health is an issue, its collateral effect in the case before us properly confines us to the manifestations brought to bear on the person being interviewed.

What we have said here must be read in the light of the factual situation involved where upon cross-examination an attempt is made to embark upon a boundless exploration of motivational processes of the mind. Further, some of the questions were objectionable for other reasons. Thus, an inquiry as to whether there was any purpose for failing to inform the doctor of his rights would have presented an inference of a duty that we have found did not exist.

The final aspect of the cross-examination contention arose out of Lehman's attempt to interject into the interrogation certain opinion words and phrases contained in the agents' Jencks statement relating to the interview. Thus, Barrett typified his own interrogation as "pressing." The characterization of conduct is not ordinarily the province of the witness, but, insofar as it is proper, it would seem to be the function of the trier of fact. The witness is to relate the facts. The fact finder determines the facts where conflicts with regard thereto exist and then evaluates the impact of the facts so established.

Further, we see no reason for this aspect of proof not being a two-sided coin. If the agents' report had characterized Lehman as appearing "guilty as sin," and this had been offered in evidence by the Government, an objection certainly would have followed and equally certainly would have been sustained.

What we have said, of course, would not have precluded the use of some of the characterizations by way of impeachment if proper foundation had been laid. Cf. United States v. Standard Oil Co., 316 F.2d 884, 891–892 (7th Cir. 1963). Thus, if the agent had testified that he had barely questioned Lehman when the doctor proceeded to volunteer information, it would seem proper to permit the asking of a properly phrased impeaching question related to the time, place and source of the contrary assertion that the agent "continued to press" Dr. Lehman. Although no proper foundation question was proposed here, the necessity did not exist because the agent's testimony sans characterization amply reflected the actual factual situation. The district court properly restricted the testimony to what was said and what was done.

We find no merit in the various cross-examination matters raised.

## IV

Dr. Lehman complains that the court committed reversible error in refusing to allow one of his nurses to testify at the trial to statements made by him shortly after the IRS agents left on June 8 and with regard to his physical appearance at that time. The court's unwillingness to admit the testimony assertedly prevented the jury from considering all the evidence relevant to the voluntariness of Dr. Lehman's confession.

If allowed to testify, the nurse would have described the doctor's physical appearance, his nervousness and his incoherence. She also would have repeated his statements to her that he feared to contact anyone, that the agents had not allowed him to call his bookkeeper, that their "pounding" at him to explain the discrepancies in the records had led him to assume the blame in order to "satisfy" them, and that the agents had assured him he would get "just a slap on the wrist."[15]

Dr. Lehman made his initial damaging admission between 3 and 4 p. m. The nurse talked with him by telephone at 5:45 or 6 p. m. and, in person, soon thereafter for several hours. Apparently Lehman would have us assume that his mental and physical state when he was observed by the witness reflected his condition earlier, at the time of the IRS interview. We would further have to assume that his condition was caused by the agents' overcoming his will. Lehman's behavior as revealed in the record simply does not support a determination that he was in an irrational state, his resistance broken at the time of the interview.

The district court had heard the trial-offered testimony fully at the suppression hearing. We find it did not abuse its discretion in excluding observations about the doctor's appearance and condition at a time sufficiently subsequent to the events to which they were attempted to be related as to have no real probative value. There was no sufficient nexus of similarity of appearance and condition at the two times to make the proposed testimony necessarily admissible.

We are also unpersuaded that the statements the doctor supposedly made to the agents and to which the nurse would have testified would help show what his mental state had been during the conference with the agents. Rather, those statements primarily embody Dr. Lehman's after-the-event version of what was said and done by himself and by the agents.[16] They are at best only tenuously related to whether Lehman had been suffering from fear and nervousness at the time of the interview to the extent of rendering his confession involuntary.

Further, if these words and deeds had been presented by a witness who had observed the interview, the testifier would have been subjected to cross-examination about his observations. Here, however, cross-examination could not reach the verity of what occurred during the day but could only explore whether the nurse was truthfully relating the hearsay statements of the doctor to her.

We also cannot agree with Lehman that his declarations come within the "res gestae" exception to the hearsay rule, which allows into evidence "statements uttered under stress of excitement produced by a *startling event* and made *before the declarant has had time or opportunity to reflect or contrive.*" C. McCormick, Law of Evidence § 272, at 578 (1954) (emphasis added). Lehman had the opportunity to "reflect or contrive," and the tax investigation

---

15. The witness had been permitted to give this information at the hearing on the motion to suppress. At trial, defense counsel made an offer to prove based on the questions asked the nurse and her answers at the hearing. The "slap on the wrist" promise was specifically denied by the agent.

16. Dr. Lehman, as was his right, did not testify at the trial.

was not so startling an event as to dispel our qualms about the trustworthiness of the defendant's statements. The district court ruled wisely—the dangers attendant upon admitting those declarations outweighed their utility.

We are satisfied that the district court did not err in refusing to permit the nurse to testify about the doctor's communications to her on the evening of June 8.

## V

Lehman also argues for reversal because of the failure of the court to give four of his tendered instructions.

The most significant contention involves the omission of the following instruction:

"The income tax law does not require that all of one's receipts be deposited into a bank account. It only requires that all such receipts be reported on the taxpayer's income tax return. Thus, if a person deposits only part of his receipts and retains the remainder for his own use, he has not violated the law, provided all of his taxable receipts of which he is aware, is [sic] reported by him as income on his tax return."

 The seriousness of the failure to give this instruction lies in the fact that the judge had said he would give the charge but inadvertently failed to do so. After the jury retired, the omission was called to his attention, but he declined to call the jury back for the one instruction.

Because jury deliberations had not yet commenced, and inasmuch as the judge had said he would give the instruction, it might seem to have been desirable to recall the jury for that purpose despite the attendant risk of overemphasis on one instruction.

That the judge did not do so obviously stems from his belief, which we share, that it would not have been prejudicially erroneous to have refused to give the instruction in the first place. At the time the instructions were settled, the district court had characterized the instruction as "argumentative" but stated that it did not see any particular harm in giving it. The charge, therefore, was marked to be given.

Lehman attempts to demonstrate essentiality for the giving of the instruction because of Government evidence of a comparative cash deposit analysis for the years 1963–1966, which included one post-indictment year. By that evidence, the Government showed that Lehman had failed to deposit any significant amounts of cash in his bank account. The approved, but not given, instruction, Lehman says, supported his theory of defense and rebutted the unfavorable inferences the Government sought to make from the size of the deposits. Lehman relies upon cases such as United States v. Indian Trailer Corp., 226 F.2d 595, 598 (7th Cir. 1955), to support his contention that the instruction should have been given.

 We concede that a defendant ordinarily is " 'entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility . . . .' " United States v. Indian Trailer Corp., *supra*. However, we do not find that the innocuous instruction in question has the dignity of stating a theory of defense. The abstract statement of the law, not applied to the facts of the case, was not controverted. Indeed, Revenue Agent Fatten on cross-examination testified as follows:

"Q. You being an expert and qualified as an expert, is there any obligation for a taxpayer to deposit all of the money that he earns into a bank account?

"A. No.

"Q. So, the fact that he held back this $33,500 is not improper?

"A. It is not improper."

Lehman also attempts to show prejudice in the omission because of certain statements of the Government in final

argument. However, the challenged statements indicated that more checks were written than the net taxable income, which would not seem to reflect one way or another upon whether all or less than all income had been deposited.

The lack of necessity of depositing all income was argued to the jury without challenge. We would not find reversible error in a refusal to give the instruction, and we do not in its inadvertent omission.

■ Lehman next complains of the court's refusal to give an instruction which would have required the jury before crediting the doctor's admissions to have found them truthful beyond a reasonable doubt. In our opinion, the instruction as tendered does not correctly state the law. Assuming that the admissions were found to be voluntary, they were subject to the same considerations as all other testimonial items. The court had correctly instructed the jurors on the burden of proof and had further advised them that if they found the admissions to be voluntary, they should consider them with all other evidence and that it was the province of the jury to weigh and determine credibility.

The tendered instruction singling out one phase of the evidence was not improperly refused.

■ A somewhat similar challenge was levelled at the refusal to give an instruction which would have required the jury *to disregard the admissions entirely* unless the jury found beyond a reasonable doubt that the doctor did not make the admissions to protect other people in the office.

The issue before the jury was whether the doctor did not report all of his income and not whether he had assistance in the commission of the crime. The proposed instruction would have thrown out the admissions on an insufficient basis and was properly refused.

Finally, Lehman objects to the refusal to give his version of the voluntariness standards for crediting admissions.

Factors were spelled out more explicitly in the tendered instruction than in the instruction given by the court, but we do not find that the instruction given did not adequately and correctly advise the jury as to the law on the particular matter, nor that it was reversible error to refuse the tendered instruction.

## VI

■ Dr. Lehman vigorously contends that the district court relied on improper factors in imposing sentence. The appellant alleges that the court rejected his request for leniency because, instead of pleading guilty, he chose to exercise his right to stand trial—to put the Government to its proof and to raise defenses thereto. He argues that he therefore comes within a very special category of defendants unhappy with their sentences and that he is entitled to the extraordinary relief of a review of his sentence by this appellate court and a remand for resentencing. He asks us, as part of our review, to compare the recommendations in the presentence investigation report with the actual sentence imposed on him.

His claim rests on the district court's remarks at the allocution hearing.[17] We

---

17. The pertinent remarks are:
"Well, I only wish that the doctor in this case, after making his original confession, which he did make, and under the circumstances the jury heard and which I heard, had gone home and decided, having made that, that he was going to live with it and take the consequences. I think that he would be in a different position today standing before me if he had, in effect, having made a *clean breast of it*, of the affair, had decided that he was in trouble, yes, of course he was in trouble, but *he had the opportunity to come in here and offer a plea* and stand before me, as he is today, with a request for leniency on the basis that he had made a bad mistake and ask me for leniency. *But he chose a different course. He chose to come in, and,* instead of, in effect, saying, 'I got myself in trouble and I am sorry,' he, in effect, *tried to convince the jury through trial tactics* . . .

have examined those comments closely and find them ambiguous. It is clear, however, that unlike the district courts criticized in Scott v. United States, 135 U.S.App.D.C. 377, 419 F.2d 264 (1969), and Thomas v. United States, 368 F.2d 941 (5th Cir. 1966), the district court below did not try to pressure the defendant into admitting the guilt that he had denied at trial.

The court seemed to be saying: (1) it would have looked more sympathetically on the plea for leniency if Lehman had pleaded guilty; and (2) in light of the solid proof adduced against the defendant, the court was dismayed that he had attempted at trial to absolve himself of responsibility by suggesting that members of his office staff, not he, were guilty of the wrongdoing. The first group of remarks is of greater concern to us, for it does suggest that the district court might have been penalizing Lehman for exercising his rights, a

"forbidden reason." *Cf.* United States v. Grooms, 454 F.2d 1308 (7th Cir. 1972); United States v. Wiley, 267 F.2d 453 (7th Cir. 1959).

We are persuaded, however, that the sentencing court merely employed unfortunate phraseology and was not, in fact, imposing an unlawful penalty. In so interpreting the remarks, we give much weight to earlier comments of the court that reveal it fully appreciated the importance of Lehman's challenge to the voluntariness of his confession and of his submission of his records.[18] We think that the court was explaining, albeit somewhat ineptly, that he considered a policy of leniency following a plea of guilty to be proper but that sentence concessions flowing from such a plea are inapplicable to the full trial situation. This philosophy is not the same as the view that a defendant should receive an "extra severe" sentence if he chooses to go to trial.[19]

---

*that perhaps he didn't commit this offense,* that perhaps some unnamed person in his office—and there is not a shred of evidence of that happening, except the fact that there were at least two young ladies in the office, or one young lady, who assisted you in the bookkeeping. But there isn't any question but that you were aware of what was going on. There isn't any question but that the doctor was aware of the fact that he was taking money home that he should have been accounting for. . . .

"Having admitted all that, then to come into court here and take the witness stand in an attempt to convince me that these men put him under such pressure that he confessed to something that didn't happen, this I think is indefensible under the circumstances. Whatever sympathy I had for the doctor at the beginning, when he takes this course, with the attempt, in effect, to blame somebody else for his own wrongdoing, I don't think that he is entitled to as much consideration as the person who comes in, admits that he is wrong, and says, 'I made a mistake,' and that's it.

"On that basis I am going to sentence him. . . ."
[Defendant's emphasis.]

18. During the suppression hearing, after defense counsel had discussed what he expected the evidence would show and the Government's attorney had disputed counsel's assessment, the trial court remarked, "Well, we need a hearing and so you may proceed."

Later, at the conclusion of the hearing, the trial court again expressed its opinion as to the importance of the issues raised by Dr. Lehman's motion to suppress:

"I have reached the conclusion that whatever decision I make on this motion to suppress is probably going to be decisive of this case, I mean, although I understand the fact that there may be some defense apart from the defense on the motion to suppress, but it is certainly a very decisive—and the Government apparently takes that position, acknowledges that position, that without the material obtained in the motion to suppress, you are not in a position to proceed with the prosecution of this case."

[Government's counsel replied: "That is right."]

19. We note that the American Bar Association has approved the practice of granting "charge and sentence concessions to defendants who enter a plea of guilty or nolo contendere when the interest of the public in the effective administration of

The sentence actually imposed further belies the contention that Lehman was improperly punished. Under the applicable statute, the maximum penalty on the four counts would be imprisonment for twenty years, a $40,000 fine, and the costs of prosecution. Lehman's sentence is not only far less than this maximum, but it is not at odds with the recommendations in the presentence investigation report.

We read the other remarks by the district court as a mere expression of its personal opinion of Lehman, such opinion, however, obviously not influencing nor bringing about a sentence which can be considered as unduly severe.

## VII

While we have not been persuaded by Dr. Lehman's arguments that his constitutional rights were impermissibly invaded during the day he spent with the revenue agents at his own office, we would not deny an assertion that during his days in court his defenses were vigorously and forcefully presented. Our independent review of the transcript convinces us that capable counsel effectively and energetically not only presented but preserved each point in his client's favor. A review also, however, convinces us that Dr. Lehman had a fair trial. Many of the points preserved below and presented here are posited on basic constitutional rights claims. We have carefully considered all of the contentions and their decusating aspects. Upon so doing we are satisfied that the conviction should stand.

In accordance with the views expressed herein, the judgment of conviction is affirmed.

Affirmed.

criminal justice would thereby be served." ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty § 1.8(a) (Approved Draft, 1968). It has also decided:

"The court should not impose upon a defendant any sentence in excess of that which would be justified by any of the rehabilitative, protective, deterrent or other purposes of the criminal law because the defendant has chosen to require the prosecution to prove his guilt at trial rather than to enter a plea of guilty. . . . "

*Standards* § 1.8(b).

Apparently the Seventh Circuit has never ruled decisively on the propriety of such sentence disparity. As the Government suggests, this court's post-*Wiley* decisions have narrowed considerably the impact of *Wiley*, and that opinion is unclear on the matter. We need not resolve this knotty problem here, for Lehman states that he is not attacking the practice of giving those defendants who plead guilty a lighter sentence than they might otherwise receive.