WOOD, Chief Judge, and ROVNER and WILLIAMS, Circuit Judges, dissenting. Psychological coercion, questions to which the police furnished the answers, and ghoulish games of “20 Questions,” in which Brendan Dassey guessed over and over again before he landed on the “correct” story (i e., the one the police wanted), led to the “confession” that furnished the only serious evidence supporting his murder conviction in the Wisconsin courts. Turning a blind eye to these glaring faults, the en banc majority has decided to deny Dassey’s petition for a writ of habeas corpus. They justify this travesty of justice as something compelled by the Antiterrorism and Effective Death Penalty Act (AED-PA). If the writ, as limited by AEDPA, were nothing more than a dead letter, perhaps they would be correct. But it is not. Instead, as the Supreme Court wrote in Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), “[t]he writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law,” Id. at 91, 131 S.Ct. 770. It is, the Court went on to say, “a guard against extreme malfunctions in the state criminal justice systems.” Id. at 102, 131 S.Ct. 770 (citation and internal quotation marks omitted). As the district court and the panel majority recognized, we have before us just such an extreme malfunction. Dassey. at the relevant time was 16 years old and had an IQ in.the low 80s. His confession was coerced, and thus it should not have been admitted into evidence. And even if we were to overlook the coercion, the confession is so riddled with input from the police that its use violates due process. Dassey will spend the rest of his life in prison because of the injustice this court has decided to leave unredressed. I respectfully dissent. I As the Wisconsin Court of Appeals correctly noted, the question whether a confession is voluntary (ia, not coerced) is assessed in light of the totality of the circumstances.' The age and sophistication of the person being questioned are critical factors. When the suspect is a minor, courts must review the confession and record with “special care.” J.D.B. v. North Carolina, 564 U.S. 261, 280-81, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011); In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Gallegos v. Colorado, 370 U.S. 49, 53-55, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948). Courts also must take the suspect’s intellectual capacity into account. Culombe v. Connecticut, 367 U.S. 568, 620, 625, 81 S.Ct. 1860, 6, L.Ed.2d 1037 (1961) (opinion of Frankfurter, J., joined by Stewart, J.); 639 (Douglas, J., joined by Black, J., concurring); 641-42 (Brennan, J., joined by Warren, C.J., and Black, J., concurring). Dassey, as the majority concedes, was-a mentally limited 16-year-old. It was thus incumbent on the state courts to evaluate his “confession” in light of those traits. The Wisconsin courts failed to take this essential step. When asked at oral argument where one might find evidence that the state appellate court1 took the required special care, counsel for the state came up dry. All counsel could do was to point out a brief mention in the state court’s opinion of Dassey’s age and mental cápabilities. But so what? The Supreme Court has never said or implied that the totality of the circumstances are beside the point as long as the state court simply jots down a fact without a hint about if or how that fact influenced the outcome. There is nothing “special” (or even meaningful) about a naked word on a page. The reader has no idea whether the state court mentioned the word meaning to indicate that it found the factor irrelevant (which would have been inconsistent with the clear Supreme Court precedent listed above), or exculpatory, or damning. Notably, even though the Wisconsin Court of Appeals gave a nod to the totality test, it made no mention of the special-care standard for juvenile confessions. To be sure, Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), holds generally that federal courts may not draw any dispositive conclusions from a state court’s silence. But by the same token, the state court’s silence cannot be leveraged into any assurance that the court went the extra mile required by the pr.S. Supreme Court and gave Das-sey’s age and limited mental ability particularized care. The majority’s finding to the coptrary has no support in the record. Wbrse, the majority writes off in a footnote Dassey’s extreme suggestibility by casting doubt on the applicability of a formal test (Gudjonsson). Ante at 305 n.2. As the painstaking review of the record reflected in Judge Rovner’s panel opinion reveals, even a lay-person could see readily that Dassey yielded to any suggestion the person in authority made. 860 F.3d 933 (7th Cir. 2017) (Dassey I), More generally, no court is entitled to pick and choose which evidence to consider when evaluating the totality of the circumstances. Clearly established U.S. Supreme Court decisions compelled the Wisconsin court to pay special attention to Dassey’s age and intellectual abilities, including his high level of suggestibility. Its failure to do so is one reason why it erroneously concluded that Dassey’s “confession” was not coerced. If the Wisconsin Court of Appeals had done what it should have, it could not reasonably have concluded that Dassey’s confession was either voluntary or reliable (both of which are required for the use of a confession to be consistent with due process). Nevertheless, first the state and now the en banc majority have culled a sentence here and there and have attempted to craft a coherent confession from them. The video recording of the police interrogation of Dassey, however, tells another story—one that is diametrically opposed to the state’s tidy and selective summary. Among the many red flags are the following: • Dassey’s answers to questions frequently changed at the detectives’ prodding. • The officers laid a trail of crumbs (indeed, large sign-posts) to the confession they sought. • Whenever Dassey went off-course, the investigators would shepherd him back in the desired direction—at times with the use of fatherly assurances and gestures, and frequently by questioning his honesty. • On both February 27 and March 1 the detectives misleadingly conveyed to Dassey, whose ability to think abstractly was minimal, that his “honesty” was the “only thing that will set [him] free.” • Through subsequent questioning it became clear that “honesty” meant “what the investigators wanted to hear.” Dassey’s age and mental limitations made him particularly susceptible to this psychologically manipulative interrogation. Many of the officers’ tactics appear to be drawn from the “Reid Technique,” which was for some time the most widely used interrogation protocol in the country. Miriam S. Gohara, A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques, 33 Fordham Urb. L.J. 791, 808 (2006). The technique heavily relies on false evidence ploys and other forms of deceit. Id. at 809. It follows a nine-step approach: [A]n interrogator confronts the suspect with assertions of guilt (Step 1), then develops “themes” that psychologically justify or excuse the crime (Step 2), interrupts all efforts at denial (Step 3), overcomes the suspect’s factual, moral, and emotional objections (Step 4), ensures that the passive suspect does not withdraw (Step 5), shows sympathy and understanding and urges the suspect to cooperate (Step 6), offers a face-saving alternative construal of the alleged guilty act (Step 7), gets the suspect to recount the details of his or her crime (Step 8), and converts the latter statement into a full written confession (Step 9). Saul M. Kassin, On the Psychology of Confessions: Does Innocence Put Innocents at Risk?, 60 Am. Psychologist 215, 220 (2005); see Edwin D. Driver, Confessions and the Social Psychology of Coercion, 82 Harv. L. Rev. 42, 51-55 (1968) (explaining the social psychological impact of the Reid tactics). Investigators are encouraged to start by accusing the suspect while emphasizing the importance of telling the truth. Fred E. Inbau et al„ Criminal Interrogation and Confessions 213 (4th ed. 2001). They learn ways to build false empathy with suspects, such as shifting the moral blame for the offense to another person or expressing understanding for the suspect’s actions. Id. at 213, 241-42. Investigators are encouraged to sit physically near the suspect, maintain “soft and warm” eye contact, and speak sincerely. Id. at 214, 349. When a suspect makes an admission implying guilt, investigators are directed to make statements of reinforcement. Id. at 366. The technique builds in confirmation bias; the instructions assure investigators that while an innocent suspect will stay resolute in her denials, a guilty person will submit to the “theme” the investigator presents. Id. at 213; see Christian A. Meissner & Melissa B. Russano, The Psychology of Interrogations and False Confessions: Research and Recommendations, 1 Canadian J. Police & Security Servs. 53, 56-57 (2003). Courts have long expressed concern about approaches such as the Reid Technique that rely on psychological coercion. Just four years after the first edition of the manual was published, Inbau et al., supra, at ix, the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), “repeatedly cited and implicitly criticized” the Reid approach. Gohara, supra, at 808 n.93; Miranda, 384 U.S. at 457, 86 S.Ct. 1602 (“To be sure, this is not physical intimidation, but it is equally destructive of human dignity.”). Miranda commented that the Court for decades had “recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.” Id. at 448, 86 S.Ct. 1602 (quoting Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (I960)). Nothing in that respect has changed: the Court continues regularly to hold that psychological coercion can render a confession involuntary. Arizona v. Fulminante, 499 U.S. 279, 287-88, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); Schneckloth v. Bustamante, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Following the Supreme Court’s guidance, we too have repeatedly recognized that “psychological coercion alone can result in an involuntary confession .... ” United States v. Lehman, 468 F.2d 93, 100 (7th Cir. 1972) (conceding that “subtle psychological ploys” can render a confession involuntary); Etherly v. Davis, 619 F.3d 654, 663 (7th Cir. 2010) (considering possible psychological coercion as part of the totality test; while noting the need to distinguish between coercion, on the one hand, and encouragement to tell the truth, on the other); United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir. 2009) (“[A] false promise of leniency may render a statement involuntary ....”); United States v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998) (“A confession is voluntary if, in light of the totality of the, circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant’s free will.”); Burns v. Reed, 44 F.3d 524, 527 (7th Cir. 1995) (describing the “body of due process case law, which generally proscribes the physical or psychological coercion of confessions" as “well-established, albeit heavily fact-dependent”). Outside the court room, our nation has long acknowledged through its international commitments that mental'mistreatment can be just as bad as its physical counterpart. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, Dec. 10, 1984, 1465 U.N.T.S. 85 (defining torture to encompass physical and mental pain and suffering).' The majority opinion downplays this reality by refusing to acknowledge anything more than mental exhaustion and false promises. But far worse than that was going on. Dassey’s investigators refused to leave him alone until he gave them an “honest” answer—where “honest” meant the , answer that the officers wanted to hear. One aspect, though by no means the only one, of the-coercion was the false promise that “honesty” would “set him free.” But there was so much more. A brief review of what went on shows that these tactics fell decisively on the “coercion” side of the line. The majority finds some significance in the notion that the detectives’ tactics were not per se coercive, but that is a red herring. These cases cannot be assessed based on one sentence, or one restroom break, or the comfort (or lack thereof) of one room. The Supreme Court has instructed that the voluntariness inquiry requires a full consideration of the compounding influence of the police techniques “as applied to this suspect.” Miller, 474 U.S. at 116, 106 S.Ct. 445. Many of the factors the majority cites as evidence leaning in favor of a finding of voluntariness— the soft interview room, offers of food and drink, normal speaking tones—viewed in the context of the types of questions and answers the investigators were demanding and Dassey’s conceded intellectual disabilities, were coercive. Psychological literature makes this clear. See Saul M. Kassin, The Psychology of Confession Evidence, 52 AM. Psychologist 221, 223-24 (1997) (criticizing the Reid Technique’s maximization methods, or scare tactics, such as the false evidence ploy, in addition to its minimization methods, which “impl[y] an offer of leniency,” where .police lull a suspect into a “false sense tof security” by expressing syinpathy, blaming an accomplice, and underplaying the gravity of. the situation); see also Meissner & Russano, supra, at 57-60 (discussing the “coercive” nature of the Reid interrogation techniques and particular concerns for minors and suspects with low intelligence). The state and majority brush aside even the possibility of psychological coercion as applied to Dassey. They claim that Dassey’s March 1 confession revealed certain “critical” details that were corroborated by independent evidence, some of which law enforcement never publicly disclosed. I have several responses to that argument. First, it rests on the.false idea that if a .confession is “accurate,” that indicates that it was not coerced. See Conner v. McBride, 375 F.3d 643, 652-53 (7th Cir. 2004) (considering, under the totality test, the reliability of a confession to support a conclusion that the confession was voluntary). But coercion and reliability are two different things. A confession can be coerced yet reliable, or it can be voluntary but unreliable. Yet even if it were true that Dassey’s confession revealed “critical” details, the confession would not be admissible in evidence if the totality of the circumstances demonstrated that' it was not voluntary. Just as importantly, a closer examination of the supposedly reliable facts on which the majority relies shows that they are no such thing. Without reliable facts, there is no way to draw the Conner inference (ie., to base a finding of voluntariness on the reliability of the facts), questionable though that link might be. This justifies a look at the reliability of Dassey’s confession, even if for present purposes lack of reliability is not a stand-alone theory. A look at how some of these “key” facts emerged instills no faith in either their reliability or their knowing and voluntary quality. For ease of reference, I have summarized in the following chart how the investigators extracted the “critical” details they were looking for from Dassey. It shows that there was nothing to ensure that Dassey was offering his own independent recollection. Instead, the officers used a combination of leading questions, coaching, and refusal to accept one of Dassey’s guesses as the “final” answer until it matched what they wanted to hear. [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] The majority concedes that AEDPA does not require a “nearly identical factual pattern” to find that a decision involved an unreasonable application of law. Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (citation omitted). But that is in essence what the majority has demanded. In arguing that even non-AEDPA cases have found confessions voluntary under similar circumstances, the majority cites two decisions. But as it concedes, Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), is critically different: Michael C. was of average intelligence and had many prior interactions with the criminal justice system. Id. at 726, 99 S.Ct. 2560. While Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), may superficially appear to be more similar to Das-se/s case, it is of dubious relevance given the fact that it was decided (along with Michael C.) decades before the Supreme Court instructed lower courts to recognize the unique psychological vulnerabilities of youth stemming from their incomplete neurological development. See, e.g,, Graham v. Florida, 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); Roper v. Simmons, 543 U.S. 551, 569-70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The Wisconsin Court of Appeals failed reasonably to apply in any meaningful way at least three principles that the Supreme Court has clearly established: (1) special care for juvenile confessions, (2) consideration of the totality of the circumstanqes, and, most importantly, (3) prohibition' of psychologically coercive tactics. This led to the kind of extreme malfunction in the adjudication of Dassey’s case for which section 2254(d)(1) provides a remedy. By turning a blind eye to these problems, the majority has essentially read habeas corpus relief out of the books. II There is a second, independent, reason why the district court • correctly granted Dassey’s habeas corpus petition and our original panel was correct to uphold that ruling: the Wisconsin Court of Appeals made unreasonable factual determinations. See Brumfield v. Cain, — U.S. —, 135 S.Ct. 2269, 2276, 192 L.Ed.2d 356 (2015) (granting habeas corpus relief under section 2254(d)(2), without needing to reach petitioner’s section 2254(d)(1) argument). The district court, whose factual assessments deserve some deference from us, found that the Wisconsin Court of Appeals erroneously concluded that investigators made no promises of “leniency.” According to the district court, though no statement in particular rendered the confession involuntary, the cumulative effect of investigators’ tactics overbore Dassey’s free will. The. majority dismisses this concern ber cause there was-no “specific” promise, of lenience. But as the district court concluded, when examining the totality of the circumstances, it is clear that .Dassey was guessing at what he thought the investigators-wanted to hear so that he could leave. Dassey was reassured across two days of interviews that being “honest” would allow him to go “free.” Although an adult of average intelligence might recognize the Biblical allusion, see John 8:32 (“You will know the truth,.and the truth will set you free.”), Dassey was not an adult and not of average intelligence. Instead, he was a mentally limited teenager who did not understand abstractions. Playing their “20 Questions” game, the officers forced Das-sey to try out different answers until he stumbled upon the answer they wanted— defined by them as the answer that was sufficiently truthful. And what was Das-sey’s response after all this? He asked if he was free to go back to school to turn in a project that was due, and when told that he could not, he indicated that he thought he would be in jail for just one day. No more conclusive evidence of his literalism and his lack of understanding is needed. By finding no promises of lenience were made and that the confession was voluntary, the Wisconsin Court of Appeals made an unreasonable determination of fact in light of the clear and convincing weight of the evidence. Ill Under AEDPA, the role of the federal courts in reviewing Dassey’s petition for habeas relief is quite limited. But AEDPA does not paralyze us in the face of a clear constitutional violation. The Due,Process Clause and the right against self-incrimination demand that, in order to be admissible in evidence, a suspect’s confession must be, voluntary. Dassey’s was not. Because the detectives used coercive, interrogation tactics on an intellectually disabled juvenile, Dassey’s will was overborne during his March 1 interrogation. Without this involuntary. and highly unreliable confession, the case against Dassey was almost nonexistent. This court should be granting his petition for a writ of habeas corpus and giving the state an opportunity to retry him, if it so desires. I respectfully dissent.