UNITED STATES of America, Plaintiff-Appellee,

v.

Lewis F. SHELTON, James Darrough, John Derry, Donald Burks, and Carl Bledsoe, Defendants-Appellants.

Nos. 79–2101, 79–2102, 79–2103, 79–2104 and 79–2157.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1980.

Jan. 21, 1982.

Certiorari Denied April 19, 1982. See 102 S.Ct. 1989.

Richard Hollis, Bruce D. Locher, Marilyn J. Schroeder, Springfield, Ill., Giles A. Franklin, Chicago, Ill., John R. Martin, Atlanta, Ga., for defendants-appellants.

Thomas W. Turner, Asst. U. S. Atty., Springfield, for plaintiff-appellee.

Before SPRECHER and CUDAHY, Circuit Judges and WILL,[*] Senior District Judge.

CUDAHY, Circuit Judge.[**]

The five defendants[1] involved in these criminal appeals were indicted by a federal grand jury for conspiracy to commit mail fraud and 77 substantive counts of mail fraud arising out of the establishment of a farmers cooperative in southern Illinois. Defendants Derry, Shelton and Darrough were also indicted for income tax evasion involving the proceeds from their allegedly fraudulent scheme. 26 U.S.C. § 7201 (1976). After a lengthy trial, the defendants were all found guilty of conspiracy as well as some but not all of the mail fraud counts. The jury also returned a verdict of guilty with respect to the tax evasion counts. Defendants have raised numerous questions on appeal regarding the sufficiency of the evidence, the instructions, various evidentiary rulings and the propriety of their sentences. We affirm in all respects except as to defendants Burks and Bledsoe, whose judgments of conviction are vacated and remanded for resentencing.

### I. The Farmers Cooperative Scheme

In what seems to be a bucolic variant of a "Ponzi scheme," [2] the defendants sought out investors in 1975 who would buy stock in a management company, First National Management ("FNM"). FNM was then supposed to use the proceeds of the stock sale as a loan to establish the Illinois Farmers Marketing Association ("IFMA"), which was in fact a farmers cooperative. IFMA was to be further funded by long-term unsecured

---

[*] The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

[**] Many volumes of the lengthy trial transcript were bound separately in several segments with identical labelling and pagination. We have numbered these volumes A, B, C, etc., to facilitate references to the record. *E.g.,* Tr. XIA; Tr. XIB.

[1.] Two other defendants, James Fenoglio and Ernest Dinora, pleaded guilty prior to the trial of the instant case and have not appealed.

[2.] A "Ponzi scheme" is a type of fraud which requires an ever increasing stream of investors in order to fund obligations to the earlier investors, with a resulting pyramiding of the liabilities of the enterprise. The appellation is derived from one Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days.

Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due. A more complete account of Ponzi's exploits can be found in *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). We do not intend to suggest that the scheme in the instant case is by any means on all fours with Ponzi's efforts. Here, for example, there was no requirement for prompt repayment of the capital of the earlier investors. But the schemes are similar to the extent that a heavy and steady influx of new capital was desirable, if not essential, to continued operation. For example, when confronted with the cooperative's lack of working funds in December of 1975, Darrough and Shelton both stated that "we'll just issue more securities like they do over in Missouri. We won't worry about running out of money." Tr. IV at 47–48. This approach is characteristic of a "Ponzi scheme."

promissory notes sold to individuals and known as Harvester Agreements. The Harvester Agreements were 20 year loans by farmers to IFMA at a 7% annual rate of interest. Farmers could invest in IFMA by one lump-sum payment of $4,000, 3 annual payments of $1,400 or 20 annual payments of $360. In consideration of making these loans, the farmers became members of the cooperative and eligible both to sell farm products and to purchase supplies at facilities that would be established by the cooperative. Members also shared in a small percentage of the gross sales volume of the cooperative's stores. The capitalization for the cooperative was intended to be supplied by the Harvester Agreement loans together with a loan of $150,000 from FNM. FNM's stockholders were then expected to receive a return on their investment through management and consulting fees for services rendered by FNM to IFMA during the first six months of the cooperative's existence and through a share of FNM's 2% override of IFMA's gross sales. FNM's management and consulting fees were based upon a percentage of IFMA's receipts from the proceeds of the Harvester Agreement loans. FNM's shareholders assigned all these fees payable to FNM to Shelton, Darrough and Derry in a series of partial assignments. Gov't Exs. 87Q, 87R and 87S.

Both FNM and IFMA were successful at raising considerable sums of money. As time passed, however, investors became disgruntled over the apparent lack of progress towards the establishment of facilities for the cooperative. On March 22, 1976, this grumbling reached its peak. A meeting was held and new directors were added to the board of FNM to dilute the defendants' control. On March 23, 1976, the investors stormed the offices of the cooperative, broke down the door and seized the corpo-

rate records. As of March 23, 1976, the defendants' involvement in the scheme had effectively ended.

In retrospect, the most difficult problem in the entire arrangement from the point of view of investors was that the "management and consulting fees," sales commissions and expenses incurred during the first year left FNM and IFMA so underfunded that the grocery stores, grain elevators and meat packing plants supposedly planned by the cooperative remained an improbable, if not impossible, dream. The financial shortfall occurred despite the impressive sums of money that were raised by FNM and IFMA in a short time during 1975–1976. Thus defendants Darrough, Shelton, Derry and Fenoglio sold $222,000 in FNM stock.[3] Only $32,500 of the cash proceeds was actually loaned to FNM. But disbursements of over $125,000 to the defendants and other disbursements for operating expenses left FNM with a cash balance of $2,437 on March 26, 1976.[4] In addition, IFMA itself raised approximately $645,000 through the Harvester Agreement loans. Most of this money, $503,000, was paid out in sales commissions and consulting fees. Operating expenses consumed most of the remainder and IFMA had only $27,448 on hand when the scheme collapsed. Over $830,000 was paid out by FNM and IFMA in less than a year with little or nothing to show for the expenditures. The roles of the five defendants involved in this appeal in this financial disaster will be detailed further as we consider the sufficiency of the evidence with respect to each defendant.

## II. The Sufficiency of the Evidence on the Conspiracy Count

The crime of conspiracy is an agreement to violate the law. *United States v. Craig*, 573 F.2d 455, 485 (7th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 82,

---

**3.** There was also testimony in the record that the actual sale of FNM stock amounted to $239,000. Tr. VA at 207. In the face of this uncertainty, we have chosen the lesser figure to avoid casting the defendants in an unfair light.

**4.** We are here using the balances of FNM and IFMA *as of March 26, 1976*, because that is the date of the external audit ordered after the

farmers took over the cooperative. While the balances were higher as of March 23, 1976, the expenditures between March 23 and March 26 were generated by the cooperative while it was under the defendants' control. Much of the difference can be attributed to checks outstanding as of March 23, 1976.

58 L.Ed.2d 110 (1978). Such an agreement is rarely susceptible of proof by direct evidence but may be inferred from circumstantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The defendants in the instant case were charged with conspiracy to commit mail fraud. 18 U.S.C. § 371 (1976). This offense requires that the fraudulent scheme be the object of the conspiracy and that it be reasonably foreseeable that the mails will be used in furtherance of the scheme. *Craig*, 573 F.2d at 486.[5]

a) Defendants Burks and Bledsoe

Our melancholy tale begins with the exploits of defendants Burks and Bledsoe, for it was by dint of their entrepreneurial efforts that this fraud came to Illinois. Like most successful frauds, the farmers cooperative scheme had been used before. Thus, from 1972 to 1977, a similar farmers cooperative scheme operated in Missouri, Oklahoma and Arkansas.[6] Defendants Burks and Bledsoe were particularly involved in the operation of the Progressive Farmers Association ("PFA"), the Missouri counterpart of the IFMA.

In late 1974, Burks contacted an acquaintance in Illinois, James Fenoglio, about a possible business venture. Defendants Burks and Bledsoe then flew to Illinois and presented the farm cooperative idea to Fenoglio based upon the purported (but illusory) success of PFA in Missouri. Burks and Bledsoe agreed, for a fee of $50,000 due in two installments of $25,000 each, to help Fenoglio establish an Illinois cooperative. Personal problems prevented Fenoglio from acting on the idea, however, at that time.

In March of 1975, Burks contacted Fenoglio again and indicated that he had two people to "help" Fenoglio get the Illinois cooperative off of the ground. Burks sent defendants Shelton and Darrough to "help"

Fenoglio although Fenoglio quickly assumed a secondary role in the Illinois venture.

Burks and Bledsoe agreed to assist Fenoglio in setting up the Illinois farm cooperative. As stated in their agreement:

[o]ur assistance will be in the nature of setting up your administrative offices and all the procedures necessary for a smooth functioning operation. We will hold your first sales training school and your first sales meeting. We will be available during the first twelve months for consultation and advice as needed to properly build your organization. Our fee for this service will be a total of $50,000.00 in cash; $25,000.00 payable upon the completion of your stock offering in the management and consulting corporation. The other $25,000.00 will be due and payable by the Co-op upon the completion of issuing 500 instruments.

Gov't Ex. 92C.

Burks and Bledsoe supplied examples of various PFA documents including the sales "pitch book" used to persuade farmers to loan money to the cooperative. This pitch book contained numerous misrepresentations regarding, *inter alia*, the safety of the farmers' investment, its alleged "deposit" characteristics and the rate of return for farmers who did not continue to make the annual $360 loan to the cooperative. The IFMA virtually copied the PFA documents and pitch book supplied by Burks and Bledsoe.

Burks also addressed two meetings of FNM investors and IFMA salesmen. He glowingly described the PFA operations in Missouri and falsely stated that PFA investors had just received a dividend of $148.00. Tr. IIID at 35. At that time, PFA was losing money at a considerable rate and had not paid any dividends. Burks argues that

---

**5.** None of the defendants challenge the foreseeability of the use of the mails.

**6.** Defendant Bledsoe and others were convicted of various offenses in connection with these activities in Missouri. Their consolidated appeals are now pending before the Eighth Circuit. *United States v. Phillips*, Nos. 80–2000,

80–1998, 80–2114, 80–1999, 80–2001 (8th Cir. 1981). Oral argument was heard on September 14, 1981. Defendant Burks was indicted for his activities in Missouri but his trial was severed from that of the other defendants and stayed pending the outcome of this appeal.

he was unaware of the magnitude of PFA's losses and that PFA's financial statements actually revealed a profitable operation. These statements were based upon a surrealistic accounting system, however, whereby borrowed capital funds from the Missouri counterpart of the Illinois Harvester Agreements were treated as "income" with no resultant increase in PFA's liabilities. Certainly, there were no profits based on anything even the most "creative" accountant would *reasonably* regard as "income" and "expenses." We believe that the jury could have inferred, based upon Burks' position as President of PFA, that he was quite aware of PFA's precarious financial status. *See also* Gov't Ex. 83T–3 (PFA financial statement of March 1975 with Burks' name on it).

In addition, Burks stated in 1977 to a Missouri law enforcement officer that PFA had been forced to issue stocks and bonds because the proceeds of the promissory notes all went out in commissions and PFA had insufficient funds to keep the business operating. Tr. XIB at 85–86. Although this statement occurred after Burks' representations to the meetings in November of 1975, the sale of PFA stock that Burks was describing took place prior to September of 1975. The jury could have inferred from Burks' admission that he was aware of PFA's financial trouble prior to November of 1975 and that he thus falsely represented in the November meetings that PFA had had an enormous growth in assets, Tr. IIID at 25, that PFA was "profitable," Tr. IIID at 25, that PFA provided a "fast return" on investments, Tr. IIID at 25, and that an investment in the Illinois venture was as "safe as gold." Tr. IIID at 34.

Burks also responded to an inquiry from the Illinois Attorney General's office before the scheme collapsed by indicating that Darrough and Shelton had once been representatives of PFA. Gov't Ex. 83G. In late 1976, however, Burks told an IRS agent that Shelton and Darrough had never

worked for PFA. Tr. XVI at 112–14. Burks' earlier statements to the contrary may have been designed to corroborate the similar representations made by Shelton and Darrough to Illinois investors and thus to frustrate the Illinois investigation into the cooperative.

With respect to defendant Bledsoe, Bledsoe stated in September of 1975 that PFA had changed from a non-stock to a stock cooperative to prevent PFA from going broke. Tr. XIC at 22. Bledsoe was thus even more clearly aware of PFA's financial problems in September of 1975 than was Burks. This is not surprising given Bledsoe's position as a "consultant" to PFA and one of the four men who shared PFA's "consulting fees." We also note that Bledsoe was involved in the preparation of PFA's financial statements. Tr. XIC at 8–13.

Bledsoe was also the principal liaison between himself and Burks and the IFMA operation with respect to the development of the various documents essential to IFMA. Tr. XIA at 86. In connection with Bledsoe's efforts in this regard, he proposed using an offering letter in Illinois to accompany the sale of each Harvester Agreement with disclosures as to the nature and risk of the IFMA investment. When IFMA's attorney responded with an offering letter that was more explicit, however, Bledsoe discouraged its use because it was "too descriptive of the potential risk." [7] Bledsoe did appear to acquiesce when the IFMA attorney stood firm regarding the use of the more explicit offering letter. Tr. XD at 20–21.

With respect to both Burks and Bledsoe, we also think it important that they supplied Shelton, Derry and Darrough with the PFA consulting agreement, Gov't Ex. 83L, which was virtually an exact model for the Illinois counterpart. This similarity is particularly probative of a conspiratorial agreement between Burks and Bledsoe and the other defendants because this document

7. No offering letter ever accompanied the sale of IFMA Harvester Agreements despite the efforts of IFMA's lower echelon staff, persons

not defendants in the instant case, to comply with the requirement of IFMA's attorney that the offering letter be used.

pertained to the sole source of even potentially legitimate financial returns to Shelton, Derry and Darrough from the Illinois operation. The form of the consulting agreement would have certainly been a topic of discussion among the conspirators and the jury could have used this evidence as one basis to infer an agreement among the defendants. In return for their consulting services to the Illinois operation Burks and Bledsoe together received $25,000.

Finally, defendant Bledsoe directed John Weston Chase, PFA Secretary-Treasurer, to show Illinois investors around the PFA operation in Missouri. Given the constant comparison by both Burks and Bledsoe of the potential development in Illinois to the presumed actual development of PFA in Missouri and the use of similar comparisons by Shelton, Derry and Darrough to entice Illinois investors, it was essential that Illinois investors have the opportunity to view the PFA facilities. These tours, which Bledsoe made possible despite the absence of any provision for them in the Burks-Bledsoe/Fenoglio agreement, were necessary to facilitate IFMA's efforts to sell Harvester Agreements and FNM stock.

■ Based upon all of the above evidence, we feel that the jury could have inferred that Burks and Bledsoe agreed to help Shelton, Derry[8] and Darrough defraud Illinois investors through the use of the FNM/IFMA investment scheme. The jury could have inferred that Burks and Bledsoe agreed to sell Shelton, Derry and Darrough the unsound PFA concept with the potential for lucrative personal returns through the FNM/IFMA consulting agreement. Burks and Bledsoe also assisted the other three defendants in selling the fraudulent concept to Illinois investors through various misrepresentations about the success of the Missouri operation.

### b) Defendants Shelton and Darrough

Our conclusion with respect to Burks and Bledsoe clearly requires that we uphold the jury verdict with respect to defendants Shelton and Darrough on the conspiracy count. We will elaborate further, however, only to illustrate how much additional evidence was presented with respect to Shelton and Darrough that could sustain the jury's verdict.

■ Shelton and Darrough received numerous checks from both FNM and IFMA during the life of the scheme. These checks were generally for less than $5,000. Shelton actually requested that large disbursements be made by a series of smaller checks. When all of these checks were totaled, Shelton and Darrough had each received *exactly* $93,383.50. For this to be mere coincidence in the face of the lax bookkeeping system of FNM and IFMA would be most improbable. Rather, we feel that the jury could have concluded that Shelton and Darrough agreed to pursue the scheme together and on an equal basis. This agreement, coupled with the numerous misrepresentations indicative of fraudulent intent[9] made by both Shelton and Dar-

---

8. Burks and Bledsoe had little or no direct contact with Derry. Because we uphold the jury's conspiracy verdict with respect to Derry based upon his contacts with Shelton and Darrough, we hold that all five defendants could be viewed as members of the same conspiracy to defraud Illinois investors. The performance of different functions in fulfilling the objective of a single conspiracy is characteristic of a single conspiracy. *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1969).

9. Both Shelton and Darrough consistently overstated the "success" of the failing PFA operation in Missouri at meetings for IFMA salesmen and when selling stock in FNM. Shelton and Darrough also falsely told FNM investors that they would receive a quick return on their investment, that FNM was raising money to lend to the cooperative and that only $150,000 in FNM stock would be sold. In particular, the sales tactics used with respect to the excess FNM stock sales would have permitted the jury to conclude that Shelton and Darrough were acting with fraudulent intent. *See* Part III, *infra*.

In October of 1976, Shelton also bragged to a social acquaintance about the fraud he had pulled off in Illinois against some dumb farmers. Tr. VIIIB at 190. Shelton then pulled out a scrapbook of IFMA newspaper clippings to show his acquaintance. This evidence was properly admitted against Shelton as an admission by a defendant. Fed.R.Evid. 801(d)(2)(A).

rough during the operation of the scheme, constitutes sufficient evidence to sustain their conspiracy convictions.

■ Shelton and Darrough also participated in an attempt to block a state investigation into the farmers cooperative by bribing a state official. In January of 1976, the defendants learned of the state investigation. Shelton told Fenoglio to contact defendant Ernest B. Dinora, a friend of Fenoglio's, to see if something could be done to halt the investigation. Fenoglio later informed Shelton, Darrough and Derry that Dinora would require at least $8,500. Shelton and Darrough then each wrote a check to Fenoglio for $4,250. Fenoglio cashed the checks and reported that the money had been given to Dinora. Dinora testified that he had passed the money on to his brother. His brother made an attempt to secure information about the investigation and reported that the defendants were in a "bushel of trouble." Even though no evidence was introduced that a bribe was actually offered to any state official, we feel that the jury could have relied on this evidence to conclude that Shelton and Darrough were engaged in a conspiracy to operate the cooperative in a fraudulent and illegal manner.

c) Defendant Derry

■ Derry argues that whatever else was going on, he was not involved in the fraudulent scheme. Derry emphasizes the testimony in the record suggesting that Derry was a "bystander" with respect to the management of the cooperative.

From the beginning, Derry was something of an outsider. Shelton and Darrough came to Fenoglio together at the start of the scheme and they were obviously much more in control of later events. Perhaps because of frustration over his lesser role, Derry assigned his interest in the consulting agreement to Shelton on February 19, 1976, and had no further dealings with the cooperative after that time.[10]

Nonetheless, we uphold Derry's conviction for conspiracy because sufficient other evidence was presented to the jury regarding Derry's involvement to sustain the jury's verdict. Derry was actively involved in the sale of FNM stock and contacted many prospective purchasers, usually accompanied by Darrough or Shelton. Derry also commented that "I've never had a bank account when I'm working on a deal . . . I usually keep cash." Tr. IV at 108. This admission indicates that Derry was not a naive bystander to the suspect dealings of the cooperative.

Two other factors also support a finding of conspiracy. Derry shared equally with Shelton and Darrough in the proceeds of the lucrative consulting agreement. In addition, Derry shared equally in the proceeds of an attempt to sell the cooperative idea to Indiana promoters in a manner similar to Burks and Bledsoe's original sale of the PFA contract to Fenoglio. Derry was a participant in the negotiations for the Indiana sale together with Shelton and Darrough. Tr. XB at 99. We believe that the jury could have reasonably found that Derry joined the common scheme of the other defendants through an agreement to defraud Illinois investors.

### III. The Sufficiency of the Evidence on the Mail Fraud Counts

■ Given that the defendants conspired to operate the farmers cooperative scheme, each "conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy." *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981). It is not necessary, therefore, that each defendant have committed fraudulent acts with respect to each count. Rather, each defendant is vicariously liable for the overt acts committed by the other conspirators to further the overall scheme.

■ In order to prove a violation of the mail fraud statute, 18 U.S.C. § 1341 (1976), the prosecution must establish 1) a scheme to defraud and 2) the use of the mails in

---

**10.** The jury did not convict Derry on any substantive counts of mail fraud that occurred after he had divested himself of his interest in the scheme.

furtherance of the scheme. *United States v. Keane*, 522 F.2d 534, 544 (7th Cir. 1975), cert. denied, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). We have no difficulty in finding overwhelming evidence to support both of these elements.

■ With respect to the scheme to defraud, there was ample evidence that the entire cooperative plan was conducted in a fraudulent manner. Beginning with FNM, investors were told that FNM was selling $150,000 in stock and that the proceeds would be loaned to IFMA to get the cooperative started. Gov't Ex. 87Z (pre-incorporation stock subscription agreement). In fact, Shelton, Darrough, Derry and Fenoglio sold over $220,000 in stock, thus diluting the ownership interest of all FNM investors. This oversubscription was hardly inadvertent. Shelton admitted it outright, Tr. XIV at 230, and the sales tactics of the other defendants would implicate them in this aspect of the fraud. Numerous investors were told that they were the "last one" to get the opportunity to invest in FNM because there was only one "spot" left. *E.g.*, Tr. VIIA at 50; Tr. VIIIB at 113. At least one investor was told that someone had turned in his stock so that there was $10,000 in additional stock available for sale. Tr. XIV at 48. Efforts were also made to keep the FNM investors apart by not answering requests for a list of investors. *See, e.g.*, Tr. IX at 165; Tr. IX at 81; Tr. IIA at 69–70; Tr. XIV at 230.

Despite the oversubscription, FNM never fulfilled the frequent representations of Shelton, Darrough and Derry that the $150,000 would be lent to IFMA. Only $32,500 was actually loaned to the cooperative in cash although worthless promissory notes were executed for much larger sums.

Shelton, Darrough and Derry also indicated to some investors that they had personally invested in FNM, usually in the amount of $25,000 each. *E.g.*, Tr. XIV at 225–26 (Derry—would invest); Tr. VIA at 113 (Darrough and Derry); Tr. XIV at 153 (Shelton—$10,000 invested); Tr. XIV at 49 (Derry); Tr. IIB at 34 (Shelton). None of the defendants ever purchased any FNM stock, however.

Darrough, Derry and Shelton ostensibly were employed by FNM. Their only legitimate claim for compensation was based upon FNM's assignment of the proceeds of the FNM/IFMA consulting agreement to these three defendants in equal shares. Gov't Exs. 87Q, 87R and 87S. Darrough, Derry and Shelton were thus "entitled" to one third of the proceeds of IFMA Harvester Agreement sales. As best we can determine, Darrough and Shelton were each "entitled" to $71,210.66 under their respective portions of the partial assignments.[11] Darrough and Shelton each received $93,383.50, however, an amount much in excess of their "entitlement."

Darrough, Derry and Shelton also each received substantial expense reimbursements. But, the three identical partial assignments, Gov't Exs. 87Q, 87R and 87S, provided that their share of Harvester Agreement sales was *in lieu of* "salary and expense." FNM paid Darrough and Derry's rent, utility bills and telephone bills for their joint apartment. Gov't Exs. 135, 136, 155–B. Shelton billed FNM for local motel rooms and meals for his family for periods of as long as a month. Tr. XIII at 212–13. All three defendants frequently billed FNM for dinners and entertainment at local restaurants and night spots. Tr. IX at 181–83.

■ Finally, Shelton, Darrough and Derry all sold FNM stock on the misrepresentation that there would be a quick return for investors (6 months to one year). *E.g.* Tr. XIV at 107. Such a quick return was made impossible, however, by the "consulting fees" and excessive expenses charged against FNM by the three defendants. In particular, we note their receipt of the partial assignment of the FNM/IFMA consulting fees, described by one witness as

11. Because Derry withdrew from his position as a consultant on February 19, 1976, we are unable to determine with any precision his portion of the consulting fees as of that date. The external audit of IFMA was done as of the March collapse, and it is difficult to determine the financial facts as of other points in time.

a "sweetheart contract," Tr. XIA at 111. Derry, Shelton and Darrough received a total of one third of the first year's sales of IFMA Harvester Agreements and a small residual percentage of 19 years of future sales in exchange for *six months* of consulting and management assistance for the co-operative. It is not unlawful to seek and accept generous compensation from a new corporation. Under the circumstances of the instant case, however, the defendants' conduct amounted to fraud because they knew that their "fees" under the partial assignments and their excessive expenses made such a quick return unlikely. *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968) (concealing material facts can constitute fraud). The availability of capital is critical to a new venture but the defendants arranged their compensation and conducted their organizational activities on such a lavish basis that there was no chance for the cooperative to achieve any return on the farmers' investment during its first year.

■ Defendants note that the farmers who were FNM shareholders and the IFMA representatives signed the FNM/IFMA consulting agreement and three partial assignments. Defendants then argue that signing the documents after an opportunity to review their contents removed any element of fraud. Our review of the record leaves little doubt that the farmers were not given a sufficient opportunity to view the documents. Farmers were told that the documents were mere formalities, Tr. XB at 67, and that it was not necessary to read them. Tr. XIV at 155. The documents were often presented to the farmers as they tended their crops and they were thus unable to devote their full attention to the contents. Tr. XIV at 111; Tr. VIA at 24–25; Tr. XIV at 155; Tr. IIA at 66. No attempt was made to alert the farmers to the critical nature of the partial assignments, documents which signed away FNM's most important source of revenue for the first year to Darrough, Shelton and Derry. While the circumstances of each signing differed, we believe that the jury could have found that many of the approvals were fraudulently obtained in a manner designed to obscure the true import of the documents presented.[12]

The other principal aspect of the scheme, the sale of Harvester Agreements, was also accompanied by ample evidence of fraud. First and most importantly, we view the Harvester Agreement pitch book, Gov't Ex. 91–A, as fraudulent. The book describes the Harvester Agreement as a "deposit" that would enable farmers to "save" $1.00 per day ($360.00 per year). Another page describes the three ways to "save and deposit." The Harvester Agreement is also compared to other kinds of savings such as government bonds, savings accounts and credit union accounts. Other references to "deposits" and the twenty-year "depositing period" abound. In reality, the Harvester Agreement was merely a loan in the form of an unsecured 20-year promissory note. The pitch book indicated that the Harvester Agreement provided "Financial Security" when in reality it was a high risk investment.

The pitch book contained the additional misleading element of a "guarantee" that

---

12. It was essential that the defendants keep the FNM investors apart lest the victims learn of the oversubscription of FNM stock and begin to ask questions about FNM's financial well-being. At the same time, the defendants needed to get the signatures of all of the investors on the consulting agreement and partial assignments. If every investor signed the same sheet, the last to sign would be able to review a list of all of the FNM investors, a potential source of difficulty for the overall scheme.

Although the implications are pure speculation, we note the peculiar physical characteristics of the consulting agreement and the partial assignments. The signature pages of each document are in duplicate; there are thus duplicates of page 4 of the consulting agreement and duplicates of page 2 of the partial assignments. Investors seem to have signed the respective pages in two clearly distinct groups, possibly reflecting an attempt to prevent any one investor from signing a page with a complete list of stockholders. We also note that there was no apparent physical need for the duplicate signature pages because all of the signatures could have fit comfortably on one page.

IFMA would "pay a high rate of return for as long as 20 years." The pitch book indicated that this rate of return would be 7%. Farmers were led to believe that they could "quit anytime" and still receive the IFMA's "high rate of return." Yet, under the terms of the Harvester Agreement, this assurance is false. The annual rate of return was only 2.34% if a farmer made only one annual "deposit" of $360, discontinued his participation and waited 20 years for his return. Tr. XC at 14; Gov't Ex. 99A.

Representations made by Harvester Agreement salesmen buttress our conclusion that Harvester Agreement sales were conducted in a fraudulent manner.[13] Salesmen emphasized that the investment was "safe," in part because it was patterned after PFA, and PFA had been so successful in Missouri. *E.g.,* Tr. VIA at 62; Tr. VIIA at 10; Tr. IX at 46.[14] At least one salesman stated that the Harvester Agreement investment was secure because the proceeds were being placed in a trust or escrow account.[15] Tr. VIIIB at 130. No such account was ever established, however, and the proceeds of Harvester Agreement sales were quickly dissipated.

An explicit evaluation of the risks of a Harvester Agreement investment would have also been an invaluable aid to poten-

tial investors. IFMA's attorney drafted an excellent offering letter that warned investors of many of the pitfalls of an IFMA investment. The attorney categorically stated from the beginning that IFMA should not sell the Harvester Agreements without giving the investor a copy of the offering circular. Tr. XIA at 47. No offering letters were ever distributed, however, despite the additional urging of the IFMA treasurer in December of 1975. Tr. IV at 54. Shelton told the treasurer that "it will kill every sale we've got," and that "we are not about to send those out."[16] *Id.* Darrough agreed with Shelton's assessment. Tr. IV at 55.[17] On December 19, 1975, the IFMA attorney stated in a letter to Shelton that there was "no excuse" for continuing to sell the Harvester Agreements without the offering letter. Gov't Ex. 87U. These warnings were repeated in a meeting between Shelton and the attorney in early 1976. The jury could have reasonably concluded that the defendants acted affirmatively to hide the risky nature of the investment from investors.

Based on the evidence set out above and the evidence noted with respect to the conspiracy count, as well as our reading of the voluminous transcript, we con-

---

**13.** All of the defendants challenge the admission of hearsay statements of the IFMA salesmen that were recounted at trial by Harvester Agreement purchasers. Rule 801 of the Federal Rules of Evidence provides, however, that [a] statement is not hearsay if ... the statement is offered against a party and is ... a statement by a person authorized by him to make a statement concerning the subject. Fed.R.Evid. 801(d)(2)(C). The statements we have referred to were not only authorized by the defendants but were derived from the sales pitch book and from statements made by the defendants at sales training meetings. Such statements by salesmen may be admitted against these defendants. *United States v. Krohn,* 573 F.2d 1382, 1386 (10th Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978).

**14.** Compare similar representations made by the following defendants to various salesmen: Tr. IIIC at 16 (Shelton); Tr. IIIC at 20, 24 (Darrough); Tr. IIID at 25 (Burks); Tr. IIID at 35 (Burks); Tr. XIIB at 97–98 (Darrough and Shelton); Tr. XIIB at 119 (Shelton). Various

people also falsely stated that Missouri investors had received a dividend of $148. Tr. IIIC at 23 (Darrough); Tr. IIIC at 14 (Shelton); Tr. IIID at 35 (Burks); Tr. XIIB at 102 (IFMA Regional Sales Director, Ed Reeves).

**15.** One salesman testified that "we were lead to understand that ... all of the money was going into trust accounts." Tr. XIIB at 126. There was testimony that Shelton was the source of this misrepresentation. Tr. IIIC at 17, 24; Tr. XIIB at 119. When the treasurer of IFMA attempted to channel some of the Harvester Agreement proceeds into just such a reserve account, defendants Darrough and Shelton protested, Tr. IV at 50–51, and indicated that the treasurer should "take care of us" and the salesmen "before you worry about any reserves." *Id.*

**16.** *See also* Tr. IV at 57 (Shelton told the IFMA treasurer in early 1976 that "over his dead body they'd get mailed out.").

**17.** Derry was present but did not say anything.

clude that the jury could have found that the sale of FNM stock and the sale of IFMA Harvester Agreements constituted a scheme to defraud within the meaning of the mail fraud statute. 18 U.S.C. § 1341 (1976). Farmers invested in these two "securities" (FNM stock and IFMA Harvester Agreements) because, among other things, they hoped that IFMA would establish stores to sell farm products and provide other supplies and services for farmers. The defendants' conduct of the affairs of FNM and IFMA, however, left the farmers without any realistic possibility of having this purpose fulfilled. Material risks were concealed, misrepresentations as to the safety and return on the investment were commonplace and no one was told the degree to which consulting fees, expenses and ordinary sales commissions drained capital from the cooperative. It is not enough that the defendants might have had an honest, if ludicrously misguided, belief in the eventual success of the enterprise where their words and conduct deliberately concealed the fact that they (the promoters) posed the greatest threat to the cooperative's possible success. *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). The jury could have concluded that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension even if scattered warnings were given of the true nature of the risks and returns associated with this investment. *United States v. Beitscher*, 467 F.2d 269, 273 (10th Cir. 1972).

The defendants have attempted to show that many farmers invested because they were familiar with other farmers in the area who had invested before them. Of course, it is true that many of the farmers checked with other prior investors before they themselves invested. But, reliance by the victims upon the behavior of other previously defrauded investors could not con-

stitute a defense to these charges. It is not necessary to show that each purchaser relied upon the misrepresentations of the defendants or their agents. *United States v. Goldberg*, 455 F.2d 479, 481 (9th Cir.), cert. denied, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 665 (1972). The facts established at trial disclose precisely the kind of scheme to defraud prohibited by 18 U.S.C. § 1341.

Defendants Darrough and Shelton also challenge the sufficiency of the evidence on the remaining element of the mail fraud statute, the use of the mails. Virtually all of the mail fraud counts involved the mailing of an FNM stock certificate or an IFMA Harvester Agreement after the money was paid by the investor. Each mailing was necessary to the overall scheme even though money had already been received from the particular investor who would receive the mailing. Failure to mail out the stock certificate or Harvester Agreement would have aroused suspicion and made future sales difficult. A mailing is in furtherance of a scheme to defraud if it is designed to lull an investor into a sense of security after he has already paid for his investment. *United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir. 1979), cert. denied, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). *See also United States v. Sampson*, 371 U.S. 75, 81, 83 S.Ct. 173, 176, 9 L.Ed.2d 136 (1962); *United States v. Habel*, 613 F.2d 1321, 1325 (5th Cir.), cert. denied, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). The evidence was thus sufficient with respect to this element of the offense of mail fraud.[18]

IV. The Sufficiency of the Evidence with Respect to Income Tax Evasion

Shelton challenges the sufficiency of the evidence with respect to his conviction for income tax evasion. 26 U.S.C. § 7201 (1976). His challenge is directed at

18. We reject Shelton and Darrough's contention that the evidence was insufficient with respect to Harvester Agreement counts where the purchaser did not testify. The mail fraud statute punishes the use of the mails to further a scheme to defraud. *United States v. Read*, 658 F.2d 1225, 1240 (7th Cir. 1981). There was

testimony with respect to each of these counts that a Harvester Agreement was sent by registered mail to the purchaser. Tr. XIII at 104; Tr. IV at 7. IFMA's files also revealed registered mail receipts corroborating this testimony.

the statutory requirement that the violation be wilful and not merely negligent. *United States v. Vitiello*, 363 F.2d 240, 242 (3rd Cir. 1966). Affirmative acts to avoid payment of any tax, such as

> handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal,

constitute evidence of wilfulness. *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). Shelton filed blank returns for the years 1972 through 1975 with differing social security numbers and paid no income tax for those years. He told the treasurer of IFMA that he used a lot of social security numbers to "dazzle them with [my] fast footwork." Tr. VA at 208. He told another IFMA employee that he always gave the IRS different social security numbers to keep them guessing. Tr. XIII at 76. Shelton hindered attempts by IFMA employees to file necessary IRS documents regarding his income. Tr. IV at 105–06; Tr. XIII at 71–73. Shelton was personally given his wage statement by the treasurer of IFMA, Tr. IV at 106, but later told an IRS agent investigating his case that he had not received the necessary forms. Tr. XVI at 92–93.[19] The jury could have easily concluded that Shelton's failure to pay his income taxes in 1975 was wilful.

We also reject Darrough's contention that the Government failed to establish that his failure to pay his 1975 taxes was wilful. Darrough did not file any tax returns for 1974, 1975 or 1976. A pattern of failing to file tax returns is probative of a defendant's state of mind with regard to a particular year. *Mitchell v. United States*, 208 F.2d 854, 857 (8th Cir.), *cert. denied*, 347 U.S. 1012, 74 S.Ct. 863, 98 L.Ed. 1135 (1954), *vacated on other grounds*, 348 U.S. 905, 75 S.Ct. 311, 99 L.Ed. 710 (1955). Darrough also ran a portion of his income, his share of the proceeds of the sale of the cooperative scheme to Indiana investors, through a "corporation" that Darrough admitted was nothing more than a name and a bank account. Tr. XVI at 142. Darrough told an IRS agent that he had never received his income statement from the cooperative, Tr. XVI at 148,[20] while IFMA's treasurer testified that he personally handed the statement to Darrough. Tr. IV at 106. We think that there was sufficient evidence for the jury to conclude that Darrough's failure to pay his income taxes for 1975 was wilful. *United States v. Venditti*, 533 F.2d 217 (5th Cir. 1976).[21]

### V. Two Excused Jurors

All five defendants claim that the district judge erred in excusing two regular jurors during the course of the trial. A judge "may remove a juror and replace [her] with an alternative juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972). *See also United States v. Makres*, 598 F.2d 1072, 1074 (7th Cir. 1979). Rule 24(c) of the Federal Rules of Criminal Procedure authorizes the replacement of jurors who are unable to perform their duties. With respect to both jurors excused in the instant

---

**19.** We reject Shelton's contention that his statements to IRS agents should have been suppressed for their purported failure to follow IRS regulations in connection with his interviews. *United States v. Lehman*, 468 F.2d 93, 104 (7th Cir.), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972).

**20.** As with Shelton's argument in this regard, we reject Darrough's challenge to his statements to IRS agents based upon purported violations of agency rules. *Lehman*, 468 F.2d at 104. We also reject Darrough's similar objection based upon the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Maguire v. United States*, 396

F.2d 327, 331 (9th Cir. 1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969).

**21.** Darrough complains that his tax evasion count alleges an unpaid tax liability of $8,551.60 but that the proof at trial established a much greater liability. We see no problem or prejudice with respect to this purported variance between the indictment and the evidence. The indictment itself stated Darrough's income in 1975 in approximate terms. Darrough also failed to object at trial to any proof of his alleged tax liability in excess of that charged in the indictment.

case, defense counsel objected and were given an opportunity to argue the matter.

■ Juror Burnett telephoned on the morning of the 14th day of the trial to report that she was ill and that she would not be able to make it to court that day, a Friday. Tr. XIV at 33. Juror Burnett did not indicate whether she was so ill that she would be unable to return on Monday. We do not feel that the trial judge was required to delay the trial, however, in the hope that Juror Burnett would be well enough to return on Monday. This lengthy trial was encountering numerous scheduling difficulties given the number of defendants and other commitments of counsel and of the trial judge. As the trial judge noted,

> I have no reason to think that this juror is anything but conscientious. She's been here for how many weeks now every day, and I assume she calls in sick, she is sick, and the—there are so many lawyers and parties, and the Court's time and all—all of our time is valuable, and it seems to me to be within my discretion to excuse her, and I will.

Tr. XIV at 34. We find that the district judge did not abuse his discretion in excusing Juror Burnett under the circumstances.

■ The district judge also dismissed Juror Guy after the selection of the jury but prior to the opening arguments. Juror Guy asked to be released because she did not realize that she would be obligated from 9:00 a. m. to 5:00 p. m. for each day of the trial. She desired to be excused because a 14-year old niece from out of town was visiting her and her children. After some discussion, Juror Guy indicated that she could still serve despite having to leave her niece stranded without transportation. After considerable deliberation, the district

judge discharged Juror Guy. The judge was concerned about the effect of a potentially impatient and disgruntled juror on the jury in the context of a lengthy trial likely to have frequent interruptions. Tr. IB at 24. In light of all of the circumstances, we find that the judge acted within his discretion in excusing Juror Guy. *United States v. Brown*, 571 F.2d 980, 984–85 (6th Cir. 1978) (upholding dismissal of juror after domestic squabble).

### VI. Joinder of Counts and Defendants and the Denial of Severances

■ Joinder of counts charging two or more offenses is proper under Rule 8(a) of the Federal Rules of Criminal Procedure if the offenses are based on acts constituting parts of a common scheme or plan. Contrary to the arguments of Shelton, Derry and Darrough, the indictment could properly join the conspiracy count and the 77 mail fraud counts which were the objects of the conspiracy. *United States v. Nettles*, 570 F.2d 547, 552 (5th Cir. 1978). Joinder of the three tax counts was also proper because those counts charged Derry, Darrough and Shelton with a failure to pay income tax on the proceeds of the scheme to defraud. *United States v. Isaacs*, 493 F.2d 1124, 1159 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).[22] It was also permissible for the indictment to include the attempted bribery of the state Attorney General's office as part of the overall scheme to defraud and of the conspiracy because the bribery attempt was made for the purpose of furthering the scheme.

■ Rule 8(b) of the Federal Rules of Criminal Procedure regulates the joinder of defendants. Darrough contends that it was

---

**22.** We also reject various challenges raised to the sufficiency of the indictment. The indictment is complicated but no more than was necessary to set out the complex criminal scheme perpetrated by these defendants. While certain factual allegations were not sustained at trial, we perceive no harm to the defendants sufficient to merit reversal based on the jury's access to the indictment by means of instruction number 10 where there had been no attempt to have the trial court excise those

allegations. With respect to one allegation that was struck, paragraph 8(b) of Count I, we reject Darrough's argument that this change materially altered the theory of his criminal liability. Darrough's Brief at 45–46. The allegation pertained to an aspect of the case that was not sustained at trial, i.e., the allegation that the offering letter was required by Illinois law. Because this allegation was properly struck, it was not error to refuse Shelton's instruction addressing that issue. Shelton's Brief at 45–46.

improper to join him with the other defendants. Joinder of multiple defendants who have had significant roles in a common scheme, such as defendant Darrough, is proper under Rule 8(b). *United States v. Bernstein*, 533 F.2d 775, 789 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976).

Darrough, Shelton and Derry all argue that the district court should have granted their numerous motions for a severance, under Rule 14 of the Federal Rules of Criminal Procedure, of the respective charges against each of these defendants. Each of the three defendants allege that the "spill-over" effect of charges against the other defendants left the jury unable to fulfill its duty to determine the guilt of each defendant based upon the evidence pertaining to that defendant. The district judge gave appropriate limiting instructions during the trial when necessary, however, and carefully instructed the jury in this regard. The jury's verdict also supports our belief that no severance was necessary. Defendant Derry was acquitted on every mail fraud count in which the mailings occurred after his leaving FNM on February 19, 1976. Defendants Burks and Bledsoe were acquitted on all counts involving the sale of FNM stock, to which they had a more tenuous connection than in other matters. Such a discriminating verdict is one indication that the jury considered each defendant individually. In summary, we feel that the trial judge acted within his discretion in denying the severance motions, *United States v. Allstate Mortgage Corp.*, 507 F.2d 492, 495–96 (7th Cir. 1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975), and the

appropriateness of his decision was borne out by the discrimination shown in the jury's verdicts.

### VII. Post-fraud Evidence of PFA's Demise

At trial, the Government was permitted to put on evidence regarding the financial collapse of PFA in 1976 and PFA's eventual bankruptcy in 1977. This evidence was admitted on the theory that it was relevant to the inherent unsoundness of the PFA concept. Ultimately, however, the unsoundness of the PFA concept was only relevant to the extent that Burks and Bledsoe were aware of PFA's flaws at the time of the criminal activity alleged in the instant case. We agree with the district court that evidence of PFA's financial status shortly after the collapse of the Illinois scheme would be relevant to establish the state of the defendants' knowledge in the immediately preceding period.[23] At some point, however, the passage of time would render PFA's position irrelevant to Burks' and Bledsoe's states of mind as of March of 1976, when the Illinois scheme ended. In particular, we think that it was erroneous for the district court to admit evidence that PFA ultimately went bankrupt in May of 1977, well over a year later. Our review of the record convinces us, however, that any error from the admission of this post-fraud evidence was harmless with respect to defendants Burks and Bledsoe.[24]

### VIII. The Prosecution's Use of Immune Testimony

Defendant Bledsoe argues that his conviction should be reversed because the

---

23. An excellent example of such evidence was the testimony of one PFA employee that Bledsoe was worried about getting a new accountant for PFA after the PFA accountant, who devised the original system, died in April of 1976. Bledsoe stated that it would be difficult to get another accountant to treat capital received from the PFA promissory notes as income, a breach of generally accepted accounting principles that was responsible for PFA's rosy financial statements. Tr. XIC at 30.

24. Darrough, Shelton and Derry challenge the admission of evidence concerning PFA operations in Missouri. Such evidence was relevant

to Burks and Bledsoe's knowledge of PFA and properly admitted against them. The district court gave appropriate limiting instructions where requested. *E.g.*, Tr. XIC at 16. Further, this evidence was so clearly relevant only to Burks and Bledsoe that we decline to find any reversible error with respect to Darrough, Shelton and Derry based upon those instances where no limiting instructions were given. The PFA evidence was simply not prejudicial with respect to the three Illinois defendants because it was not contended that they had detailed knowledge of PFA's operations in Missouri.

prosecution had access to two allegedly immune sources of his testimony.[25] One source of this testimony is a document in the nature of a summary prepared by a Greene County, Missouri, grand jury investigating PFA. Bledsoe testified extensively before that grand jury pursuant to a grant of use immunity and, presumably, his testimony is reflected to some extent in the summary of PFA activities prepared by the members of the grand jury (the "PFA report"). Bledsoe's testimony was not recorded, however, and the PFA report was written based upon the grand jury's recollection of the testimony of over twenty witnesses.[26]

The PFA report was never actually read by any of the attorneys representing the United States in the prosecution before us. The lead attorney in the prosecution, Thomas W. Turner, did discuss Bledsoe's PFA activities with federal prosecutors in Missouri who had read the PFA report and Turner received a copy of a Missouri prosecution memorandum related to PFA.

We find no reversible error in Turner's possible receipt of third-hand knowledge of Bledsoe's grand jury testimony. The federal prosecutors in Missouri established that they had a source independent of the grand jury's PFA report for all of the information that the PFA report contained with the exception of one matter pertaining to the merger of National Business Consultants, Inc. ("NBC") into PFA. *See* Gov't Ex. 59; Supp.Tr. of September 17, 1979, at 251–318.[27] This latter transaction was never raised in the instant case, however, and would, in any event, have been of little relevance.[28] We have carefully considered

25. By agreement of the parties, Bledsoe's motions regarding his allegedly immune testimony were resolved both as to his trial in Illinois and as to his trial in Missouri by the district judge in Missouri presiding over the criminal cases pertaining to the collapse of PFA and other related entities. *See* note 6, *supra*. Bledsoe was a defendant in that action and questions like those raised here were raised in connection with those charges.

26. Bledsoe argues that because none of the information contained in the PFA report was attributed to specific witnesses or sources, we must assume that everything in the report was derived from his immunized testimony. The district court explicitly rejected this contention, however, finding that with the exception of one portion of the PFA report pertaining to the merger of National Business Consultants, Inc. ("NBC") into PFA, "the grand jury report neither contains any factual information which emanated from Bledsoe nor was materially affected by the Bledsoe testimony." Mem.Op. at 1. We are unable to disagree with this finding in view of the testimony by the grand jury foreman that none of Bledsoe's testimony was incorporated into the PFA report, Supp.Tr. June 25, 1979 at 158 (Williams), and the testimony of the grand jury prosecutor that the PFA report would have been no different had Bledsoe not testified, Supp.Tr. September 17, 1979 at 186 (Kelly). Employing this perspective, the only issue is whether the prosecutors in the instant case made any use of that part of the PFA report relating to the NBC–PFA merger. As the district court found (and as we conclude below), this matter was not used by the government in the instant prosecution. In addition, we have examined the record closely and conclude that none of the information contained in the PFA report was used by the government in the instant case.

27. According to the PFA report, NBC was organized under Missouri law in 1974. Its sole asset was a parcel of land known as Table Rock Heights, acquired on NBC's behalf at a purchase price of $100,000. When NBC was subsequently merged into PFA, the Table Rock Heights property was carried on PFA's books at a value of over $2,000,000 based on a purportedly fraudulent appraisal. Bledsoe's testimony to the grand jury supplied a reason why NBC had been organized with twelve shareholders when state law permitted it to have only one shareholder. Bledsoe apparently told the grand jury that NBC needed at least ten shareholders to prevent the merger with PFA from resulting in a violation of a state law which required PFA to have no shareholder that owned over ten percent of the company's stock. The grand jury concluded from this testimony that NBC had been organized as part of a preconceived plan to purchase Table Rock Heights and to inflate its value fraudulently by means of a merger into PFA. No independent source was established by the government prosecutors for Bledsoe's testimony relating to the reason why NBC had twelve shareholders.

28. The prosecuting attorney in the instant case did inform Bledsoe's attorney during the trial that he would cross-examine Bledsoe regarding the Table Rock Heights land transaction if Bledsoe testified at trial. Supp.Tr. September 17, 1979 at 236. Bledsoe did not testify and the matter was not raised at trial by the prosecution. There has been no showing, however, that Bledsoe failed to testify because of the prosecutor's remark.

the possible impact of the PFA report on prosecutorial decisions with regard to plea bargaining, cross-examination or trial strategy, but we find that the Government has met its "heavy burden" of showing that it did not directly or indirectly use any of Bledsoe's immunized testimony. *United States v. Romano*, 583 F.2d 1, 7 (1st Cir. 1978).[29]

Bledsoe's second argument focuses on his testimony in Bankruptcy Court in 1977 as President of the Farmer's Marketing Association ("FMA"), the grocery store operation founded by PFA. In early 1977, FMA filed for voluntary reorganization under Chapter XI of the Bankruptcy Act. 11 U.S.C. § 1 *et seq.* (1976). Bankruptcy Judge Jack C. Jones issued an order directing FMA to appear and show cause why an indemnity bond should not be required to protect the interests of FMA creditors during reorganization. Bledsoe appeared on behalf of FMA on April 21, 1977, and testified as to the financial condition of FMA as of 1977. At the end of the hearing, an indemnity bond was required and personally posted by Bledsoe. A subsequent order was entered directing FMA to show cause why the bond was not insufficient. That order and a reclamation petition by FMA's largest creditor, Associated Grocers, were considered at a second hearing on May 4, 1977. Bledsoe was served with a summons by Associated Grocers and was called by that creditor as an adverse witness with respect to the reclamation petition. Bledsoe only testified at the second hearing with regard to the reclamation petition.

Transcripts of Bledsoe's testimony at the second hearing on May 4th (but not the testimony at the first hearing) were read by the Government attorneys involved in the prosecution of the instant case. The thrust of Bledsoe's testimony on the reclamation petition was that FMA could be reorganized into a profitable corporation. Bledsoe's testimony in this regard was directed solely at the FMA grocery store operation. Bledsoe testified with respect to FMA's outstanding obligations, inventory, expenses and projected income under the reorganization plan.

Bledsoe contends that his testimony was immune under 11 U.S.C. § 25(a)(10) which provides that

> [t]he bankrupt shall . . . at the first meeting of his creditors, at the hearing upon objections, if any, to his discharge and at such other times as the court shall order, submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate or the granting of his discharge; but no testimony given by him shall be offered in evidence against him in any criminal proceeding . . . .

11 U.S.C. § 25(a)(10) (1976).[30] Bledsoe argues, and the Government does not dispute, that this bankruptcy provision applies, because of 11 U.S.C. § 702 (1976), to FMA's voluntary reorganization under Chapter XI. The real focus of the argument concerns whether the hearings at which Bledsoe testified were covered by § 25(a)(10) and whether Bledsoe could claim immunity for his testimony as an officer of the bankrupt corporation without a specific order designating him to testify on behalf of FMA in accordance with Rule 901(6)(A) of the Rules of Bankruptcy Procedure. *Compare United States v. Coyne*, 587 F.2d 111 (2d Cir. 1978)

---

**29.** The chief federal prosecutor in Missouri learned from a source close to the grand jury proceeding that Bledsoe's testimony was of little or no use to the grand jury. Bledsoe argues that this information was helpful to the prosecution in deciding whether to grant him immunity in exchange for his testimony. The district court concluded, and we agree, however, that this vague piece of information had no effect on the prosecution's case. In addition, there is no suggestion that this information was ever communicated to Turner.

**30.** This statutory provision has been modified substantially by the new Bankruptcy Code. *See* 11 U.S.C. 344 (1978). Immunity is no longer automatically available without a claim of the privilege against self-incrimination.

*with United States v. Castellana,* 349 F.2d 264 (2d Cir. 1965), *cert. denied,* 383 U.S. 928, 86 S.Ct. 934, 15 L.Ed.2d 847 (1966).

We need not reach this multi-faceted question of bankruptcy law, however, for we are convinced that Bledsoe's testimony was so peripheral to the issues presented in this action that any use by the prosecution of Bledsoe's allegedly immune bankruptcy testimony would be harmless error. Bledsoe's testimony concerned the failing FMA grocery operations in 1977. The focus in the instant case, however, was always on PFA, FMA's parent corporation. Bledsoe's fraudulent conduct asserted in the present case pertained to the PFA method of raising money through the sale of long-term promissory notes. The operations of the Missouri grocery store itself were far removed from the issues presented in the instant case.

We are aware that certain witnesses testified about the establishment of FMA in 1975 and whether PFA's percentage from FMA's sales was so high as to prevent FMA from ever making a profit. Tr. XIC at 16. Bledsoe's awareness that FMA was poorly structured was certainly relevant to his state of mind. If the FMA grocery operation was inherently doomed, then the jury could have inferred that Bledsoe acted fraudulently when he sold the cooperative concept to Fenoglio. The particular evidence introduced at trial regarding FMA, however, bore no relation to Bledsoe's knowledge of FMA's financial condition as of May of 1977, the subject of Bledsoe's bankruptcy testimony.[31] None of Bledsoe's testimony at the reclamation hearing was even distantly relevant to Bledsoe's knowl-

edge over a year earlier at the time of the Illinois fraud. Because we also perceive no substantial relationship between Bledsoe's bankruptcy testimony and the present action with respect to prosecutorial decisions regarding plea bargaining, cross-examination or trial strategy, we hold that any error that might have occurred from the tainted use of Bledsoe's allegedly immune bankruptcy testimony was harmless.[32] *See United States v. Hernandez,* 574 F.2d 1362, 1372 (5th Cir. 1978) (violation of the Fifth Amendment privilege against self-incrimination harmless error).

### IX. Voir Dire Regarding Pre-trial Publicity

■ Burks and Bledsoe argue that the district court did not conduct an adequate voir dire of the jury concerning pre-trial publicity. The district court asked the jurors about their knowledge of the case and whether they could render a fair verdict based upon the evidence introduced at trial. Only five jurors out of approximately forty indicated any knowledge about the case and those jurors were then questioned more extensively. Given the absence of any evidence of pre-trial publicity approaching the level of the cases cited by defendants, *United States v. Dellinger,* 472 F.2d 340, 366–77 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *Silverthorne v. United States,* 400 F.2d 627, 635 (9th Cir. 1968) (every potential juror had some knowledge about the case), we think that the district court was not required to conduct a more extensive voir dire. We see no indication at all that the nature of the pre-trial publicity resulted in defendants Burks and Bledsoe's not receiving a fair trial.

---

31. Insofar as Bledsoe's testimony revealed his awareness of FMA's financial problems, Bledsoe did not provide the Government with any information that was not already apparent from Bledsoe's position as president of FMA.

32. Bledsoe relies heavily on *United States v. McDaniel,* 482 F.2d 305, 311 (8th Cir. 1973), to establish that the Government's burden is "insurmountable" even if it did not use the immunized testimony as evidence at trial because it must establish that it did not use the testimony in an investigatory fashion or in some other way that did not result in the presentation of

evidence before the jury. We think *McDaniel* is clearly distinguishable, however, because there the immune testimony was in the nature of a confession of the defendant's misdeeds. *McDaniel,* 482 F.2d at 311. Here, in contrast, Bledsoe's testimony was hardly even incriminating vis-a-vis *this* prosecution. It was only immunized, if one accepts Bledsoe's argument on this issue, by the operation of an unusual provision of the Bankruptcy Act that extended immunity to statements without any showing of self-incrimination.

## X. The Refusal of Bledsoe's Instruction on "Puffing"

Bledsoe requested an instruction on "puffing" or exaggeration in sales activity that was refused by the district court:

> The defendants contend that assertions in sales material used by IFMA, [such as the statement concerning the "miracle of compound interest",] were not intended to fraudulently mislead investors but instead were merely "puffing" typical in sales activity. I charge you that "puffing" or mere exaggeration in sales talk [is a very prevalent practice in the course of business and] within reasonable bounds and under proper circumstances such statements are not criminal and will not support a finding of a scheme to defraud.

Tr. XVIII at 173–79.[33] We agree that there is a difference between "puffing" and representations that are sufficient to support a scheme to defraud. *See Scott v. United States,* 263 F.2d 398, 402, 401 n.2 (5th Cir. 1959); Comment, *Mail Fraud—Fraudulent Misrepresentations must be Distinguished from "Puffing" or "Sellers Talk" in Offenses under 18 U.S.C. § 1341,* 22 S.Car.L. Rev. 434 (1970). *See also United States v. New South Farm & Home Co.,* 241 U.S. 64, 70–71, 36 S.Ct. 505, 507, 60 L.Ed. 890 (1916). "Puffing," however, relates to expressions of opinion. *Miller v. Premier Corp.,* 608 F.2d 973, 981 (4th Cir. 1979). The proposed instruction does not sufficiently distinguish expressions of opinion from knowingly false statements of fact.[34] There is no requirement to give an instruction that is inaccurate or misleading. *United States v. Lisowski,* 504 F.2d 1268, 1273 (7th Cir. 1974).

The district court recognized this principle and told counsel that

> I agree with you and . . . maybe you ought to have an instruction that says . . . that anytime you make a statement of an opinion, particularly if it's in good faith, it can't be a crime.

Tr. XVIII at 177. Counsel for the Government noted that the jury was already going to be instructed on good faith as a defense to a crime requiring fraudulent intent. The district court then refused Bledsoe's instruction on "puffing" but invited counsel to submit a new instruction addressing the subject in a more appropriate manner. Tr. XVIII at 179. Counsel failed to submit such an instruction despite raising the issue again during the closing argument. Tr. XIXB at 6–7. In light of this omission and the fact that the jury was instructed on the issue of good faith, we see no basis for reversing the convictions of the defendants.

## XI. Co-conspirator Hearsay

Certain hearsay statements of co-conspirators may be admitted against all of the members of the conspiracy under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Under *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978), the district court must determine by a preponderance of the non-hearsay evidence that the following four conditions of Rule 801 have been met:

1) that there was a conspiracy,
2) that the declarant was a member of the conspiracy,
3) that the defendant was a member of the conspiracy and that
4) the statement was made in furtherance of the conspiracy.

The district court complied with *Santiago* and made the necessary determination as to the existence of the four *Santiago* conditions. All of the defendants raise this issue on this appeal although they generally fail to set out exactly what statements were admitted at trial pursuant to the co-conspirator hearsay exception. Darrough, for example has complained of numerous statements that were not in fact admitted against him, Tr. VIII at 190; Tr. IV at 119–20, or which were not incriminating. Derry also complains of testimony that was

---

**33.** During the instruction conference, Bledsoe's attorney offered to remove the bracketed portions of the instruction. Tr. XVIII at 173, 176.

**34.** *See also United States v. Beitscher,* 467 F.2d 269, 273 (10th Cir. 1972) (exaggerated sales talk still fraudulent if it would deceive persons of ordinary prudence).

at least in part not admitted against him. Shelton raises no claim in this regard beyond his general objection to PFA evidence. *See* note 24, *supra.*

We decline to search the lengthy record for specific instances of co-conspirator hearsay not raised by the defendants. *Cf. Cannon v. Teamsters & Chauffeurs Union, Local 627*, 657 F.2d 173, 177–78 (7th Cir. 1981). We thus narrow our focus to the hearsay evidence admitted with respect to the alleged attempt to bribe the Illinois Attorney General's office, the only material instance of co-conspirator hearsay adequately identified by the defendants' briefs. Burks, Bledsoe and Derry argue that it was improper to admit this evidence against them pursuant to the co-conspirator exception.

We have no doubt that the statements in question were made in furtherance of the conspiracy. With respect to the other *Santiago* conditions, we feel that the non-hearsay evidence set out above in Part II was sufficient, by a preponderance of the evidence, to meet the *Santiago* requirements with regard to the existence of a conspiracy and Burks, Bledsoe and Derry's membership therein.[35] We note in particular with respect to Burks and Bledsoe, whose involvement in the conspiracy presents a closer question under *Santiago* than that of Derry, that there was evidence that the PFA concept was so inherently susceptible to fraudulent use as to raise an inference that Burks and Bledsoe intended to promote that illegal use in Illinois through an agreement with Shelton and Darrough. *See Direct Sales Co. v. United States*, 319 U.S. 703, 711–12, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943).

## XII. The Sentencing of Shelton and Derry

▆▆ Shelton and Derry both challenge the severity of their sentences—twenty and twelve years respectively. The district court has, of course, broad discretion in sentencing. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). The evidence in the instant case established a massive fraud with over 700 victims, and losses approaching one million dollars. While the sentences given Shelton and Derry were certainly severe, they reflect the respective roles of these defendants in the fraud and the egregious nature of their actions. The sentences are within the statutory maximums [36] and we find no abuse of discretion under the circumstances. *United States v. Wilkins*, 659 F.2d 769, 773 (7th Cir. 1981).

## XIII. The Sentencing of Burks and Bledsoe

Burks and Bledsoe were each sentenced to twelve years imprisonment. At their respective sentencing hearings, the district court indicated that light sentences or probation would be appropriate if Burks and Bledsoe were innocent of the charges pending against them in Missouri with respect to PFA. Post-trial Tr. of September 10, 1979, at 16–18. The district court then assumed that Burks and Bledsoe were in fact guilty of the Missouri charges and imposed twelve year prison terms.

▆▆ It is appropriate for a sentencing court to consider evidence of wrongdoing by defendants short of an actual conviction. *Houle v. United States*, 493 F.2d 915, 916 (5th Cir. 1974). A judge may, for example, consider a defendant's apparent false testimony at the trial of the charges

35. Some of the statements were made by Fenoglio and he, as declarant, would have to be a member of the conspiracy under *Santiago*. We have not detailed Fenoglio's involvement, however, because no one has challenged his status as a conspirator. Fenoglio pleaded guilty to the conspiracy count of the indictment and has not appealed.

36. Shelton argues that since there was only one scheme to defraud, he could be sentenced to a

maximum of only five years for his activities, the statutory maximum for mail fraud. 18 U.S.C. 1341 (1976). Each mailing in furtherance of the scheme constitutes a separate offense under the mail fraud statute, however, and it is permissible to impose separate sentences for each violation of which Shelton was convicted. *Nelson v. United States*, 178 F.2d 458, 458–59 (9th Cir. 1949).

giving rise to the sentence, conduct which occurred in front of the sentencing judge. *United States v. Grayson*, 438 U.S. 41, 52–55, 98 S.Ct. 2610, 2616–2618, 57 L.Ed.2d 582 (1978). We are concerned, however, about the sentencing court's reference in the instant case to the ongoing Missouri proceedings. Where the wrongdoing short of an actual conviction is the subject of another ongoing criminal proceeding, such an assumption of guilt may infringe upon the sentencing authority of the court presiding over the ongoing proceeding. In the context of the instant case, Bledsoe was eventually found guilty of the Missouri charges, albeit after sentence was imposed in Illinois. Normally, sentence would have been imposed in Missouri based upon the severity of his conduct in Missouri as well as an assessment of the significance of his prior Illinois conviction. Because of the nature of the sentencing sequence employed in the instant case, however, the Missouri federal judge was also forced to consider whether he should reduce Bledsoe's Missouri sentence by some amount to reflect the decision of the Illinois federal judge to base Bledsoe's Illinois sentence, in part, on Bledsoe's PFA activities. While there is no explicit reference to this problem in the Missouri judge's sentencing order, that order does make Bledsoe's sentence concurrent "with any other sentence previously imposed by any other court." The Missouri fraud in dollars lost also exceeded that of Illinois by a factor of ten to one, and Bledsoe was more centrally culpable in Missouri than in Illinois. Nonetheless, Bledsoe received a shorter sentence of incarceration in Missouri than Illinois.

With respect to Burks, the problem is even more aggravated. When Burks was sentenced, his trial in Missouri was about to begin. He was subsequently severed from the Missouri trial, however, and his trial has been stayed until after this appeal. Thus, Burks has never been convicted for his activities in Missouri and there is at least a chance, especially if his heavy Illinois sentence is upheld, that he will never be prosecuted. Burks would then be sentenced based upon an assumption of guilt that he would be unable to challenge.[37]

We therefore hold that a sentencing court should not, absent special circumstances not present here, assume the guilt of a defendant based upon events which are the subject of another ongoing prosecution. In the exercise of our supervisory powers, we vacate the judgments entered against Burks and Bledsoe and remand for resentencing.[38]

### XIV.

Having examined the record, we find that the defendants' remaining arguments are without merit and unworthy of detailed consideration.

We affirm the judgments of conviction of Shelton, Darrough and Derry. We vacate the judgments against Burks and Bledsoe and remand them for resentencing.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

---

**37.** This highlights still another problem with the assumption of guilt employed in Burks' sentencing. While a judge may consider an indictment or an arrest for what those respective bits of evidence of wrongdoing are worth at sentencing, the judge must remember that they are not equivalent to a conviction. The sentencing decision employed in the instant case, however, is based upon an assumption of guilt derived from less than complete testimony regarding Burks' and Bledsoe's PFA activities. The district court could have considered what it knew with regard to Burks' and Bledsoe's Missouri activities in reaching a sentencing decision but it was improper to evaluate the evidence heard on that subject as being equivalent to a finding of guilt.

**38.** With respect to Bledsoe, it is entirely possible that our remand will be of no effect. The assumption that Bledsoe was guilty of fraud in Missouri has since been vindicated. We shall allow the district court the initial opportunity, however, to evaluate this matter.